

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Luz E. Lozada Tirado<br>Andrea Hernández Lozada<br>y Otros<br><br>     Recurridos<br><br>      v.<br><br>Roberto Tirado Flecha y la<br>Congregación Cristiana de los<br>Testigos de Jehová de<br>Puerto Rico<br><br>     Peticionarios | Certiorari<br><br><br>2010 TSPR 9<br><br><br>177 DPR \_\_\_\_ |

Número del Caso: CC-2006-94

Fecha: 27 de enero de 2010

Tribunal de Apelaciones:

       Región Judicial de San Juan Panel V

Juez Ponente:

       Hon. Carlos Rivera Martínez

Abogados de la Parte Peticionaria:

       Lcdo. Álvaro R. Calderón, Jr.

Abogado de la Parte Recurrida:

       Lcdo. Luis A. Ortiz López

Materia: Orden Transfusión de Sangre

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad ??
?

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luz E. Lozada Tirado,
Andrea Hernández Lozada,
y Otros

   Recurridos

      v.             CC-2006-94      Certiorari

Roberto Tirado Flecha y la
Congregación Cristiana de los
Testigos de Jehová de
Puerto Rico, Inc.

   Peticionarios

Opinión del Tribunal emitida por el Juez Presidente señor Hernández Denton

San Juan, Puerto Rico a 27 de enero de 2010.

La controversia planteada ante este Tribunal en el caso de autos nos brinda la oportunidad de expresarnos, por primera vez, sobre un asunto de particular importancia para nuestra sociedad. Se trata de la validez de una declaración previa de voluntad suscrita por una persona que, por sus creencias religiosas, decidió rechazar transfusiones de sangre en cualquier circunstancia –y sin sujeción a condición de salud alguna– aun cuando ello implicara peligro mortal para su vida o su salud. En esencia, debemos evaluar si es ejecutable un documento de este tipo aun en circunstancias no contempladas específicamente por la ley.

Tras un cuidadoso y concienzudo análisis del caso ante nuestra consideración, así como del derecho aplicable, concluimos que tanto la Constitución del Estado Libre Asociado de Puerto Rico, como la Constitución de Estados Unidos protegen el derecho de las personas a rechazar tratamiento médico sin sujeción a condición de salud alguna y aun cuando ello pudiera ocasionar su muerte. Por consiguiente, resolvemos que el Artículo 6 de la Ley de Declaración Previa de Voluntad sobre Tratamiento Médico en Caso de Sufrir una Condición de Salud Terminal o de Estado Vegetativo Persistente, Ley Núm. 160 de 17 de noviembre de 2001, 24 L.P.R.A. sec. 3651 *et seq*. (Ley Núm. 160), es inconstitucional en tanto en cuanto impone un límite a la voluntad válidamente expresada de un ciudadano y sujeta su eficacia solamente a circunstancias en que exista un diagnóstico particular de una de las dos condiciones allí dispuestas. Tal limitación infringe el derecho constitucional de un individuo de tomar decisiones respecto a su tratamiento médico.

No obstante, reconocemos que el derecho de rechazar tratamiento médico no es absoluto y podría ser limitado ante la presencia de ciertos intereses del Estado. En este caso, sin embargo, no quedó probado ningún interés estatal que sobrepasara el derecho del paciente de rechazar tratamiento médico. Por lo tanto, revocamos el dictamen recurrido.

I.

En abril de 2004 el Sr. Víctor Hernández Laboy, quien era mayor de edad, estaba en pleno disfrute de sus facultades mentales y era feligrés de la Congregación de los Testigos de Jehová en Humacao, otorgó ante un notario un documento de declaración previa de voluntad[1] y designación de mandatario. En dicho documento, y conforme a sus convicciones religiosas,[2] rechazó de forma absoluta e inequívoca recibir, en toda circunstancia, tanto sangre de otra persona como sangre propia almacenada, sin importar su estado de salud ni las consecuencias que tal rechazo pudiera acarrear. Específicamente, éste hizo constar en su declaración:

> Yo, Víctor Hernández Laboy, mayor de edad y en pleno uso de mis facultades mentales, firmo por voluntad propia este documento. […] Soy testigo de Jehová. Basándome en mis firmes convicciones religiosas (véase, Hechos 15:28,29) y mi deseo de evitar numerosos riesgos y complicaciones vinculados con el uso de la sangre, rechazo absoluta, inequívoca y resueltamente sangre alogénica (sangre de otra persona) y sangre autóloga almacenada (mi propia sangre almacenada) en toda circunstancia, sin importar cuál sea mi estado de salud. Esto significa que no se me administre sangre total ni ninguno de sus componentes principales (glóbulos rojos,

---

[1] Los términos declaración previa de voluntad, testamento vital y directrices anticipadas (en inglés *living wills* o *advance directives*) son comúnmente utilizados como sinónimos para definir un documento a través del cual una persona expresa sus deseos sobre el curso de acción a seguir en cuanto a su tratamiento médico en caso de sobrevenirle una condición futura que le impida expresar su voluntad.

[2] Surge del expediente que el rechazo de los Testigos de Jehová a las transfusiones de sangre se basa en ciertos pasajes bíblicos que, según su interpretación, les requiere abstenerse de recibir todo tipo de sangre. Por tal razón, creen que un individuo que recibe sangre no resucitará ni tendrá vida eterna. Además, los miembros de dicha congregación entienden que una transfusión de sangre en contra de su voluntad constituye una crasa violación a su integridad física y a sus valores.

glóbulos blancos, plaquetas o plasma sanguíneo), sean cuales sean las consecuencias. No acepto sangre aun cuando el personal médico (médicos, enfermeras, etc.) crea que sólo la transfusión sanguínea preservará mi vida o mi salud. También rehúso donar sangre con anterioridad a fin de que se almacene y posteriormente se me transfunda o se le transfunda a otra persona.

No obstante, hizo constar expresamente que aceptaba y solicitaba tratamiento médico alternativo sin sangre. El señor Hernández Laboy también expresó en el referido documento su deseo de que se respetara su voluntad y especificó que no autorizaba a nadie, ni siquiera a sus familiares, a que pasaran por alto o anularan su rechazo a la sangre. Del mismo modo, exoneró de toda responsabilidad a los médicos, anestesiólogos y al hospital y su personal por cualquier daño que resultara de su negativa a aceptar sangre. Además, el señor Hernández Laboy designó como mandatario al Sr. Roberto Tirado Flecha para que tomara cualquier decisión sobre la aceptación o el rechazo de tratamiento médico en caso de que no pudiera comunicarse por sí mismo, y nombró un mandatario sustituto.

Posteriormente, en junio de 2005, el señor Hernández Laboy estuvo involucrado en un accidente automovilístico en el que sufrió graves lesiones. Luego de ser llevado inicialmente al Hospital Ryder de Humacao, fue trasladado a la Unidad de Trauma Intensivo del Centro Médico de San Juan. Tras el ingreso del señor Hernández Laboy a dicho hospital, su esposa, la Sra. Luz E. Lozada Tirado —quien no es miembro de la Congregación de los Testigos de Jehová— acudió al Tribunal de Primera Instancia, Sala Municipal de Humacao, y solicitó que se ordenara al hospital realizar una transfusión de sangre a su cónyuge. El tribunal accedió a

la solicitud de la señora Lozada Tirado y emitió una orden *ex parte* a esos fines.

No obstante, el señor Tirado Flecha acudió al Centro Médico y se opuso, en nombre del señor Hernández Laboy, a que se le administrara sangre. A tales efectos, presentó el documento en el cual se expresaban los deseos del paciente y se le designaba como mandatario. El Centro Médico decidió respetar la voluntad del señor Hernández Laboy e hizo caso omiso a la orden emitida por la Sala Municipal de Humacao.

En vista de ello, la señora Lozada Tirado compareció ante el Tribunal de Primera Instancia, Sala Superior de San Juan, por sí y en representación de su hijo menor de edad, y presentó una petición urgente de una orden para que se realizara la transfusión de sangre al señor Hernandez Laboy.[3] En dicha solicitud expuso que el hospital se negaba a hacer la transfusión debido a las creencias religiosas del paciente. Indicó que la transfusión era necesaria para evitar su muerte, y adujo que el tribunal debía emitir la orden para proteger el bienestar del menor. Para sustentar su pedido, la señora Lozada Tirado alegó que se desempeñaba como ayudante de cocina en un centro del programa Head Start y su sueldo no era suficiente para cubrir las necesidades del hogar, por lo que argumentó que los ingresos del señor Hernández Laboy eran indispensables para el sustento del hogar y del niño menor de edad.

_____

[3] Del expediente surge que el hijo menor de edad no era hijo biológico del señor Hernández Laboy y la señora Lozada Tirado, sino que era su nieto, hijo de uno de los hijos de la pareja que había fallecido. La señora Lozada Tirado expresó al tribunal que ella y su esposo lo habían adoptado legalmente, mas no se presentó evidencia de que tal adopción se hubiese realizado.

El foro de instancia celebró una vista a la que comparecieron la señora Lozada Tirado y sus hijas por derecho propio.[4] Luego de escuchar sus testimonios, el tribunal accedió a la solicitud presentada y ordenó a la Unidad de Trauma Intensivo del Centro Médico a transfundir sangre o dializar al señor Hernández Laboy. En su orden, el tribunal indicó que no se citó al señor Hernández Laboy por éste encontrarse inconsciente y en peligro de muerte. Cabe resaltar que el tribunal tampoco citó ni escuchó al señor Tirado Flecha como mandatario del señor Hernández Laboy ni a su médico.[5]

Al día siguiente, se celebró otra vista a la cual compareció la señora Lozada Tirado —esta vez acompañada de un abogado—, así como el señor Tirado Flecha y la Administración de Servicios Médicos de Puerto Rico (ASEM).[6] En la referida vista se presentó el documento suscrito por el señor Hernández Laboy, en el cual designó al señor Tirado Flecha como su mandatario. La señora Lozada Tirado impugnó dicho documento porque, según ésta, en la declaración jurada

---

[4] Las Sras. Andrea Hernández Lozada y Elizabeth Hernández Lozada, ambas hijas mayores de edad del señor Hernández Laboy y la señora Lozada Tirado, comparecieron junto a su madre en la petición urgente que ésta presentó ante el foro de instancia.

[5] No surge de la petición sometida por la señora Lozada Tirado ni de la minuta de la primera vista celebrada por el foro de instancia que se informara al tribunal sobre la existencia del documento de Declaración Previa de Voluntad suscrito por el paciente, el cual ya había sido presentado en el hospital por el señor Tirado Flecha. De hecho, en la segunda vista celebrada por el Tribunal de Primera Instancia, cuando se presentó el documento por la representación legal del mandatario, se hizo constar en la minuta que era la primera vez que el tribunal veía tal declaración.

[6] La Administración de Servicios Médicos de Puerto Rico es la entidad gubernamental que administra las instalaciones del Centro Médico. 24 L.P.R.A. sec. 342 *et seq.*

no se hacía constar el número del medio supletorio de identificación utilizado. No obstante, el tribunal sostuvo su validez y, por ende, la designación de mandatario realizada por el señor Hernández Laboy. En su argumentación ante el foro primario, la representación legal del señor Tirado Flecha sostuvo que la resolución en la que se ordenó la transfusión de sangre constituía una violación de los derechos de libertad de culto e intimidad del señor Hernández Laboy. Por su parte, la señora Lozada Tirado reiteró su argumento de que mediaban circunstancias apremiantes que justificaban la intervención judicial.

Así las cosas, el tribunal emitió una resolución en la que reafirmó su orden anterior. Según el foro de instancia, la señora Lozada Tirado era una persona de "escasos recursos económicos" y de una "capacidad intelectual baja", lo que llevó al tribunal a concluir que ella sola no podía hacerse cargo de su hijo menor de edad. El tribunal consideró, además, que el menor podría afectarse emocionalmente con la pérdida de su padre adoptivo, luego de haber perdido a su padre biológico. Ante tales circunstancias, el tribunal entendió que existía un interés apremiante del Estado para obligar al señor Hernández Laboy a recibir sangre y a ser dializado.[7] Conforme a lo ordenado, el señor Hernández Laboy recibió la transfusión de sangre, pero a los pocos días falleció.

---

[7] El foro de instancia aclaró que, en vista de las creencias religiosas del señor Hernández Laboy, en la medida en que fuera posible debía administrársele preferencialmente un sustituto de sangre que fuera aceptado por la Congregación de los Testigos de Jehová.

Inconformes con el dictamen emitido por el Tribunal de Primera Instancia, el señor Tirado Flecha y la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc. (Congregación de los Testigos de Jehová) recurrieron ante el Tribunal de Apelaciones. En síntesis, adujeron que el tribunal de instancia erró al reconocerle autoridad a la señora Lozada Tirado para invocar un interés apremiante del Estado y justificar así la solicitud de transfusión de sangre a su esposo. Además, argumentaron que el foro primario erró al no respetar la voluntad del señor Hernández Laboy —expresada bajo juramento— y al no celebrar una vista con todas las garantías del debido proceso de ley para resolver la controversia de conformidad con los derechos constitucionales de las partes.

El Tribunal de Apelaciones desestimó el recurso de *certiorari* presentado por el señor Tirado Flecha y la Congregación de los Testigos de Jehová por entender que carecían de legitimación activa para solicitar la revocación del dictamen emitido por el foro primario. Según el tribunal apelativo intermedio, para que una declaración de voluntad de este tipo sea ejecutable, la citada Ley Núm. 160 exige que el declarante haya sido diagnosticado con una condición de salud terminal o que se encuentre en un estado vegetativo persistente.

Debido a que el señor Tirado Flecha no presentó evidencia de tal diagnóstico durante la vista celebrada en el tribunal de instancia, el foro apelativo entendió que no podía actuar como mandatario del señor Hernández Laboy, ya que la declaración de voluntad en que se hizo su designación

no era ejecutable. Por ende, concluyó que no tenía legitimación activa para litigar el presente caso ante los foros judiciales. En cuanto a la Congregación de los Testigos de Jehová, el tribunal apelativo resolvió que como ésta no fue parte en los procedimientos llevados a cabo en el tribunal de instancia, estaba impedida de esgrimir sus planteamientos por primera vez ante el foro apelativo. De esta forma, determinó que la Congregación tampoco tenía legitimación activa para impugnar la orden emitida por el foro de instancia en la que se ordenó la transfusión de sangre al señor Hernández Laboy.

En vista de tal determinación, el señor Tirado Flecha y la Congregación de los Testigos de Jehová acuden ante nos y, en esencia, aducen que erró el Tribunal de Apelaciones al concluir que no poseen legitimación activa para impugnar la resolución del foro primario. Según los peticionarios, la interpretación que hizo el foro apelativo de la Ley Núm. 160 es incompatible con los derechos de intimidad, dignidad personal, autonomía personal y libertad de culto reconocidos en la Constitución de Puerto Rico y en la jurisprudencia de este Tribunal.

Los peticionarios alegan, además, que en la declaración de voluntad otorgada por el señor Hernández Laboy éste designó al señor Tirado Flecha para que actuara como su mandatario desde el momento en que se hallara incapacitado para tomar sus propias decisiones sobre tratamiento médico. No obstante, según sus argumentos, la interpretación de la Ley Núm. 160 realizada por el foro apelativo tiene el efecto de privar al paciente de contar con alguien que vele por que

se cumpla su voluntad de no recibir sangre, hasta que se le diagnostique una enfermedad terminal o se determine que está en un estado vegetativo persistente. Es decir, los peticionarios aducen que la interpretación del Tribunal de Apelaciones le niega a todo paciente el derecho de intimidad y autonomía corporal durante períodos de incapacidad temporal, lo que según éstos derrotaría el propósito de la declaración previa de voluntad.

Por su parte, la Congregación de los Testigos de Jehová alega que no participó de los procedimientos en el tribunal de instancia porque fueron de jurisdicción voluntaria y las vistas se celebraron de manera *ex parte*. La Congregación entiende que ello no debe ser impedimento para que se le reconozca interés y legitimación activa para cuestionar la determinación de los tribunales de permitir la transfusión de sangre a uno de sus feligreses, a pesar de su rechazo expreso a dicho tratamiento médico. Según la Congregación de los Testigos de Jehová, el rechazo a una transfusión de sangre en cualquier circunstancia es una doctrina fundamental de sus creencias religiosas. Por lo tanto, alega tener legitimación activa para impugnar la acción tomada por los tribunales en el caso de autos y, de esta forma, asegurarse que la voluntad de sus feligreses será respetada a tenor de los derechos constitucionales antes mencionados y los propósitos de la propia Ley Núm. 160.

Examinado el recurso, decidimos expedir el auto de *certiorari*. La señora Lozada Tirado y sus hijas no presentaron alegato alguno, por lo que procedemos a resolver

la controversia ante nuestra consideración sin el beneficio de su comparecencia.

## II.

Como cuestión de umbral, dado que el señor Hernández Laboy falleció, debemos resolver si la controversia ante nuestra consideración se ha tornado académica.

Sabido es que la jurisdicción de los tribunales está sujeta a que los casos sean justiciables, ya que su función es adjudicar controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica. E.L.A. v. Aguayo, 80 D.P.R. 552, 584 (1958). Así, pues, los contornos del concepto de justiciabilidad se han delineado para establecer ciertas doctrinas que viabilizan la intervención oportuna de los tribunales, entre ellas la de academicidad. P.N.P. v. Carrasquillo, 166 D.P.R. 70, 74 (2005); Crespo v. Cintrón, 159 D.P.R. 290, 298 (2003); Noriega v. Hernández Colón, 135 D.P.R. 406, 421-422 (1994).

Sobre el particular, hemos resuelto que un caso es académico cuando los cambios fácticos o procesales ocurridos durante su trámite convierten la controversia en una ficticia, de modo tal que el fallo que emita el tribunal no tendría efectos prácticos por tratarse de un asunto inexistente. San Gerónimo Caribe Project v. ARPE, res. el 31 de julio de 2008, 2008 T.S.P.R. 130; P.P.D. v. Gobernador I, 139 D.P.R. 643, 675 (1995).

No obstante, hemos reconocido ciertas excepciones a la doctrina de academicidad que permiten la intervención de los tribunales aun cuando el asunto aparente haberse tornado

académico. Específicamente, los tribunales podrán atender el caso, a manera de excepción, cuando se plantea una cuestión recurrente y capaz de evadir la revisión judicial; cuando el demandado ha modificado la situación de hechos, pero el cambio no aparenta ser permanente; y cuando algunos aspectos de la controversia se han tornado académicos pero persisten importantes efectos colaterales. Angueira v. J.L.B.P., 150 D.P.R. 10, 19 (2000); Asoc. de Periodistas v. González, 127 D.P.R. 704, 719-20 (1991).

Para aplicar la excepción de cuestión recurrente se requiere que se tomen en consideración tres factores particulares: la probabilidad de la recurrencia, la identidad entre las partes involucradas y la probabilidad de que el asunto sea capaz de evadir la revisión judicial. Angueira v. J.L.B.P., *supra*. Véase, además, J. J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Editorial Temis, 2009, págs. 186-88. No es necesario, sin embargo, que exista identidad de partes para aplicar esta excepción cuando se trata de casos que requieren dilucidar derechos constitucionales de la más alta jerarquía. P.N.P. v. Carrasquillo, *supra*, pág. 77.

En el caso de autos, la controversia involucra los deseos de un paciente de rechazar tratamiento médico por razón de sus creencias religiosas, así como la validez del documento suscrito por éste para hacer constar tal rechazo y designar a una persona que vele por que se cumpla lo allí dispuesto. Ciertamente, la muerte del señor Hernández Laboy aparentaría haber tornado el caso en académico, ya que

nuestra decisión no tendrá efectos prácticos sobre él.  No obstante, consideramos que nuestra intervención en este caso está justificada, a manera de excepción, por tratarse de una cuestión recurrente capaz de evadir la revisión judicial.

El asunto planteado ante nuestra consideración es susceptible de repetirse, ya que las declaraciones previas de voluntad son cada vez más comunes y los adelantos médicos han dado lugar a múltiples controversias relacionadas con el derecho de un paciente a rechazar tratamiento médico. Además, se trata de controversias que son capaces de evadir la revisión judicial, pues involucran tratamiento médico de personas cuyo estado de salud es sumamente delicado.  Por ello, —como norma general— estos casos se tornan académicos, ya que al llegar ante la consideración de los foros judiciales apelativos se ha provisto el tratamiento en cuestión o el paciente ha fallecido.  También puede haberse realizado la transfusión de sangre rechazada por el paciente y, de todos modos, éste haber fallecido, como ocurrió en el caso de autos.  En vista de ello, y conscientes de que se trata de un caso que nos requiere pasar juicio sobre derechos constitucionales de gran trascendencia, concluimos que nos encontramos ante una excepción a la doctrina de academicidad que nos permite atender la presente controversia.

Aclarado este asunto, pasemos a examinar el derecho aplicable a la controversia ante nuestra consideración.

III.

A.

La Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico consagra el principio cardinal de la inviolabilidad de la dignidad del ser humano. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.  A base de ello, reconoce como derechos fundamentales la intimidad y la protección contra ataques abusivos a la honra, la reputación y la vida privada o familiar. Art. II, Secs. 1 y 8, Const. E.L.A., *supra*. Estos derechos tienen especial preeminencia en nuestro esquema constitucional. Soc. de Ganaciales v. Royal Bank de P.R., 145 D.P.R. 178, 201 (1998).  A la luz de las referidas disposiciones constitucionales, hemos resuelto que el Estado tiene una función dual para proteger los derechos allí contenidos: abstenerse de actuar de manera tal que se viole el ámbito de autonomía e intimidad individual y actuar afirmativamente en beneficio del individuo. *Íd*.

En nuestra jurisdicción, el derecho de intimidad impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. Colón v. Romero Barceló, 112 D.P.R. 573, 576 (1982).  Por su importancia, este derecho opera *ex proprio vigore* y sin la necesidad de que concurra el requisito de acción estatal para invocarlo frente a personas particulares. Soc. de Ganaciales v. Royal Bank de P.R., *supra*, pág. 201.  Además, hemos resuelto que el derecho de intimidad se lesiona, entre otras instancias, cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas. *Íd*., pág. 202.

Cónsono con lo anterior, hemos reconocido el derecho de todo paciente de tomar decisiones respecto a la intervención médica a la que habrá de someterse. Sepúlveda de Arrieta v. Barreto, 137 D.P.R. 735, 742 (1994). Ello incluye su derecho de consentir o rechazar tratamiento médico, luego de que su médico le haya provisto la información necesaria para tomar una decisión de esa naturaleza. Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 663-66 (1988). Esta doctrina, conocida como la doctrina del consentimiento informado, se basa en el derecho fundamental que consagra la inviolabilidad del cuerpo humano como un derecho inalienable de las personas. Santiago Otero v. Méndez, 135 D.P.R. 540, 557 n. 24 (1994); Montes v. Fondo del Seguro del Estado, 87 D.P.R. 199, 203-04 (1968).

A su vez, la doctrina del consentimiento informado impone al profesional de la salud el deber de informar a su paciente todo lo relacionado con la naturaleza y los riesgos de un tratamiento médico, de manera que éste pueda tomar una decisión inteligente e informada. Rodríguez Crespo v. Hernández, *supra,* pág. 664. De hecho, basado en el derecho de intimidad y conforme a la referida doctrina del consentimiento informado, hemos resuelto que una intervención médica realizada sin contar con el consentimiento previo del paciente es un acto torticero e ilegal. Véanse Santiago Otero v. Méndez, *supra*; Montes v. Fondo del Seguro del Estado, *supra*, pág. 203; Rojas v. Maldonado, 68 D.P.R. 818 (1948).

Por su parte, en el ámbito federal y en el derecho común anglosajón, el derecho de todo paciente a rechazar

tratamiento médico, como corolario de la doctrina de consentimiento informado, ha sido reconocido desde principios del Siglo XX. Véase, e.g., Schloendorff v. Society of New York Hospital, 105 N.E. 92, 93 (N.Y., 1914). Cónsono con ello, en el normativo caso Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261 (1990), el Tribunal Supremo de Estados Unidos resolvió que: "El corolario lógico de la doctrina de consentimiento informado es que el paciente generalmente posee el derecho de no consentir, es decir, de rechazar tratamiento". (Traducción nuestra). *Íd.*, pág. 270. Más importante aún, en dicho caso el máximo foro judicial federal partió de la premisa de que la Constitución de Estados Unidos garantiza –como parte del interés libertario protegido por el debido proceso de ley consagrado en la Decimocuarta Enmienda– el derecho de rechazar tratamiento médico, incluso cuando dicho tratamiento sea necesario para salvar la vida del paciente. *Íd.*, págs. 278-79.

En términos similares se expresó dicho tribunal en Washington v. Glucksberg, 521 U.S. 702 (1997), al reiterar que: "También hemos presumido, y sugerido fuertemente, que la cláusula del debido proceso protege el derecho tradicional de rechazar tratamiento médico no deseado para salvar la vida [del paciente]". (Traducción nuestra). *Íd.*, pág. 720. Esta protección constitucional también se puede inferir de decisiones previas de dicho foro. Cruzan v. Director, Missouri Dept. of Health, *supra*, pág. 278. Se trata, pues, de un derecho derivado de la doctrina de consentimiento informado del derecho común anglosajón y que,

a su vez, está protegido por la Constitución de Estados Unidos.

En Cruzan, el Tribunal Supremo de Estados Unidos abordó el caso de una paciente incompetente que se encontraba en estado vegetativo tras haber sufrido un accidente automovilístico. Luego de varios años, a la luz de opiniones médicas que aseguraban que la condición de la mujer era permanente e irreversible y que no había esperanza de que recobrara las facultades cognoscitivas, sus padres solicitaron una orden al tribunal para retirar el tratamiento de nutrición e hidratación que la mantenía con vida. El tribunal estatal concedió la orden por entender que existía evidencia clara y convincente, según lo requería la ley de Missouri, de que la voluntad de la paciente hubiese sido rechazar dicho tratamiento. Esta determinación fue revocada por el Tribunal Supremo de Missouri.

Ante la decisión adversa del foro estatal, los padres de la joven acudieron al máximo foro federal, el cual resolvió que en estos casos debe prevalecer la voluntad del paciente, pero reconoció como parte de su análisis que en ocasiones la única forma de hacer valer dicha voluntad es por medio de otra persona designada para tales propósitos. Cruzan v. Director, Missouri Dept. of Health, *supra*, págs. 271-74. En ese sentido, el Estado puede imponer ciertas salvaguardas procesales para garantizar que la acción del subrogado realmente responda a la voluntad expresada por el paciente mientras éste gozaba de capacidad para actuar. *Íd.*, págs. 280-87. De esta forma, en Cruzan el Tribunal Supremo de Estados Unidos validó el requisito de evidencia clara y

convincente impuesto por el estado de Missouri para determinar cuál hubiese sido la voluntad del paciente incompetente en ausencia de un testamento vital. *Íd*.

Es menester resaltar que en dicho caso la paciente no había suscrito un testamento vital ni una declaración previa de voluntad. Por lo tanto, según el propio Tribunal Supremo Federal, el derecho que ésta pudiera tener a rechazar tratamiento médico debía ser ejercido por algún subrogado. Ante esa circunstancia, el propósito del estándar de prueba adoptado por el estado de Missouri era, justamente, garantizar que la decisión de esos subrogados –en ese caso los familiares– fuese cónsona con lo que hubiera decidido la paciente de haber estado consciente. *Íd*.[8]

Sobre el particular, en Cruzan el Tribunal Supremo Federal citó con aprobación los casos In re Quinlan, 255 A.2d 647 (N.J., 1976), y Superintendent of Belchertown State School v. Saikewicz, 370 N.E.2d 417 (Mass., 1977), resueltos por el Tribunal Supremo de New Jersey y el Tribunal Supremo Judicial de Massachusetts, respectivamente. En dichos casos, ambos tribunales adoptaron un estándar de "juicio subrogado" (*substituted judgment*) mediante el cual el foro judicial debía determinar cuál hubiese sido la voluntad de una persona incompetente en cuanto al tratamiento médico. Así, los tribunales intentan situarse en la posición de la persona afectada para tomar una decisión que, sin pasar juicio sobre ella, es la que hubiese tomado el paciente de

---

[8] En consideración a ello, y a base de la evidencia presentada por los familiares ante el tribunal de instancia de Missouri, el máximo foro federal confirmó la decisión del Tribunal Supremo estatal que determinó que no existía evidencia clara y convincente de que la voluntad de la paciente hubiese sido el retiro del tratamiento.

haber estado competente. <u>Superintendent of Belchertown State School v. Saikewicz</u>, *supra*, pág. 431; <u>Care and Protection of Sharlene</u>, 840 N.E. 2d 918, 927 (Mass., 2006).

### B.

De otra parte, tanto nuestra Constitución como la Constitución de los Estados Unidos consagran el derecho de libertad de culto, el cual garantiza la práctica de creencias religiosas, ya sea de manera individual o colectiva, libre de prohibiciones impuestas por el Estado. Art. II, sec. 3, Const. E.L.A., *supra*; 1ra Enm., Const. E.E. U.U., L.P.R.A., Tomo 1; <u>Asoc. Academias y Col. Cristianos v. E.L.A.</u>, 135 D.P.R. 150, 160 (1994).[9]

Para determinar si es válida una actuación del Estado que tenga un efecto sobre una práctica religiosa es necesario evaluar la acción estatal, el interés del Estado que la motiva y el efecto que tiene sobre determinada práctica religiosa. En vista de ello, el Tribunal Supremo de los Estados Unidos ha resuelto que "una ley que sea neutral y de aplicabilidad general no tiene que estar justificada por un interés gubernamental apremiante aun cuando tenga el efecto incidental de imponer una carga sobre una práctica religiosa particular". (Traducción nuestra). <u>Church of the Lukumi Babalu Aye v. City of</u>

---

[9] Al analizar la presente controversia, somos conscientes de lo señalado por el Profesor José Julián Álvarez González en su obra al expresar que, en los casos relacionados con las cláusulas constitucionales sobre religión, tanto la jurisprudencia federal como la puertorriqueña reflejan la inevitable tensión entre la libertad de culto y la prohibición de establecer una religión. J. J. Álvarez González, <u>Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos</u>, Bogotá, Editorial Temis, 2009, pág. 1193.

Hialeah, 508 U.S. 520, 531 (1993).[10] Véanse, además, Employment Division v. Smith, 494 U.S. 872 (1990); Asoc. Academias y Col. Cristianos v. E.L.A., *supra*; Mercado, Quilichini v. U.C.P.R., 143 D.P.R. 610 (1997); Díaz v. Colegio Nuestra Sra. Del Pilar, 123 D.P.R. 765 (1989).

No obstante, ante reclamos de que una norma neutral y de aplicabilidad general afecta una práctica religiosa particular, aun cuando la ley sea constitucional de su faz podría ser necesario que el Estado realice alguna concesión para acomodar la práctica afectada. Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418 (2006). Véase, además, J. J. Álvarez González, op. cit., pág. 1193.

---

[10] En respuesta a la decisión del Tribunal Supremo Federal en Employment Division v. Smith, 494 U.S. 872 (1990), mediante la cual dicho foro rehusó aplicar el estándar de interés apremiante en casos en que se reclame que una ley neutral infringe una práctica religiosa particular, en 1993 el Congreso de los Estados Unidos aprobó el Religious Freedom Restoration Act (R.F.R.A.), 42 U.S.C. secs. 2000bb *et seq.*, el cual fue creado para prevenir que el Estado interfiriese con las prácticas religiosas de los ciudadanos mediante la aprobación de leyes neutrales. Para lograr su propósito, dicha ley dispuso que, al evaluar estatutos que tuvieran un efecto sustancial en una religión particular, debía utilizarse un escrutinio estricto y requerir al Estado demostrar un interés apremiante. 42 U.S.C. sec. 2000bb-1. Además, estableció que los ciudadanos podrían instar una acción judicial contra el Estado en casos en que la aplicación de la ley afectara la práctica religiosa en cuestión. *Íd.* No obstante, varios años más tarde el Tribunal Supremo de los Estados Unidos determinó que lo establecido en dicha ley federal no podía aplicarse a las leyes estatales al amparo de la Decimocuarta Enmienda de la Constitución Federal, por lo que sólo las leyes federales estaban sujetas a las disposiciones del R.F.R.A. City of Boerne v. Flores, 521 U.S. 507 (1997). Véase, además, J.E. Nowak y R.D. Rotunda, Constitutional Law, 8va. ed., St. Paul, West, 2009, sec. 17.6(d), págs. 1630-1636.

C.

Así, pues, tanto nuestra Constitución como la de los Estados Unidos cobijan, amparados en diversas protecciones, el derecho de las personas de no consentir o rechazar tratamiento médico. Ahora bien, como todo derecho constitucional, el derecho de rechazar tratamiento médico no es absoluto. En ese sentido, en Cruzan el Tribunal Supremo Federal dispuso que, al enfrentarse con el rechazo de un paciente a cierto tratamiento médico, los tribunales deben hacer un balance entre ese derecho y ciertos intereses del Estado. En particular, en el referido precedente se reconoció, a base de lo decidido por la jurisprudencia estatal, que el Estado puede tener interés en la preservación de la vida, la prevención del suicidio,[11] la protección de terceros inocentes y en mantener la integridad de la profesión médica. Cruzan v. Director, Missouri Dept. of Health, *supra*, pág. 271.

Aun cuando este Tribunal no ha tenido la oportunidad de expresarse sobre esta materia, existe una extensa jurisprudencia desarrollada por los estados acorde con lo resuelto por el Tribunal Supremo de Estados Unidos en Cruzan, *supra*. Dicha jurisprudencia resulta altamente ilustrativa y útil para resolver la controversia ante nuestra consideración, pues buena parte de ella involucra a pacientes que son Testigos de Jehová y que se negaron a recibir sangre por sus convicciones religiosas. Véanse,

---

[11] Sobre el particular, es menester señalar que el Tribunal Supremo de Estados Unidos ha rechazado que bajo la Constitución Federal exista el derecho al suicidio, por lo que los estados pueden válidamente intervenir con sus ciudadanos para evitar que éstos se quiten la vida. Véase Washington v. Glucksberg, *supra*.

e.g., The Stamford Hospital v. Vega, 674 A.2d 821 (Conn., 1996); In re Matter of Patricia Dubreuil, 629 So.2d 819 (Fla., 1993); Norwood Hospital v. Muñoz, 564 N.E.2d 1017 (Mass., 1990); Fosmire v. Nicoleau, 551 N.Y. S.2d 876, 879 (N.Y., 1990).[12]  En estos casos, los tribunales han realizado un balance de intereses entre los derechos constitucionales del paciente y los intereses del Estado reconocidos en Cruzan, *supra*, y otra jurisprudencia.

Específicamente, respecto al interés de prevenir el suicidio, se ha resuelto que el rechazo de cierto tratamiento médico por parte de un paciente no puede ser considerado como un intento de suicidio. Norwood Hospital v. Muñoz, *supra*, pág. 1022; Fosmire v. Nicoleau, *supra*, pág. 881; In the Matter of Claire C. Conroy, 486 A.2d 1209, 1224 (N.J., 1985).  La razón es que, en estos casos, al igual que en el caso de autos, el paciente sólo rechaza cierto tipo de tratamiento médico por razones religiosas o de otra índole, pero generalmente está dispuesto a considerar y aceptar otras opciones. **Es decir, el objetivo del paciente que rechaza algún tipo de tratamiento médico en estos casos no es privarse de la vida, sino actuar conforme a lo postulado por su fe religiosa.**

De igual forma, los tribunales han resuelto que si bien el Estado puede tener un interés en la preservación de la vida, sobre todo en un caso en el que la condición del paciente sea curable, dicho interés disminuye cuando quien toma la decisión de rechazar el tratamiento médico es el

---

[12] Véase, además, J. J. Paris, Compulsory Medical Treatment and Religious Freedom: Whose Law Shall Prevail?, 10 U.S.F.L. Rev. 1 (1975).

propio paciente. Ello es así, ya que no se trata de proteger la vida de un tercero, sino la del propio paciente que ha decidido no someterse a la intervención médica, amparado en su derecho constitucional a la autonomía personal y en su derecho de consentir o rechazar cierto tratamiento médico. Norwood Hospital v. Muñoz, *supra*, págs. 1022-23.

Asimismo, las cortes estatales han descartado que respetar la decisión del paciente de rechazar cierto tratamiento médico afecte de forma alguna la integridad ética de la profesión médica. Concretamente, se ha resuelto que la ética médica sólo obliga al profesional de la salud a proveerle a su paciente la información necesaria para que éste tome una decisión informada sobre qué tratamiento está dispuesto a recibir, pero el médico no puede actuar en contra de la voluntad del paciente. Su función es proveer tratamiento médico de acuerdo con los deseos e intereses de sus pacientes, no asumir el rol de "padre sustituto" para sobreponerse a los deseos de un adulto competente. In re Matter of Patricia Dubreuil, *supra*, pág. 823. Véase, además, The Stamford Hospital v. Vega, *supra*. A tono con lo anterior, se ha expresado que el interés del Estado en proteger la profesión médica no está reñido con el derecho del paciente a rechazar la transfusión de sangre y, de estarlo, no lo supera. Norwood Hospital v. Muñoz, *supra*, págs. 1023-24.

Por último, se ha resuelto que los foros judiciales deben considerar el interés del Estado en proteger a terceros inocentes. Este interés es el que con más

frecuencia se invoca en los tribunales en el contexto de casos sobre rechazo de tratamiento médico. La protección de terceros inocentes toma -en la mayoría de los casos- dos vertientes, a saber: el interés del Estado en proteger a menores de edad que pueden quedar abandonados por la muerte de sus padres y en que los ciudadanos se sometan a cierto tratamiento médico durante una crisis de salud pública.[13]

En cuanto a la primera vertiente, el poder de *parens patriae* del Estado le brinda un interés reconocido en el bienestar de los menores. La pregunta en estos casos es si a un adulto competente se le puede coartar su derecho de rechazar tratamiento médico debido a su condición de padre o madre. Ante tal planteamiento, algunos tribunales han expresado que, en la medida en que la muerte del paciente no redunde en el total abandono de un hijo menor de edad, el interés del Estado en el bienestar del menor no puede superar el derecho de un adulto competente de rechazar tratamiento médico. Véanse, Norwood Hospital v. Muñoz, *supra*; In re Matter of Patricia Dubreuil, *supra*; Fosmire v.

---

[13] Los tribunales han expresado que el interés del Estado en proteger a terceros inocentes puede ser invocado en casos de emergencias de salud pública. Así, se ha reconocido que el Estado puede aprobar leyes que requieran de manera compulsoria ciertas vacunas ante la amenaza de una epidemia. Véanse Fosmire v. Nicoleau, *supra*, pág. 880; Jacobson v. Massachusetts, 197 U.S. 11 (1905); J.A. Cohan, Judicial Enforcement of Lifesaving Treatment for Unwilling Patients, 39 Creighton L. Rev. 849, 895 (2006). En Puerto Rico, por ejemplo, la Ley Núm. 25 de 25 de septiembre de 1983 regula lo concerniente a la inmunización de estudiantes y niños de edad preescolar y permite que se exima de dicho requisito a los niños que demuestren que ellos o sus padres pertenecen a una religión que no permite la inmunización. 24 L.P.R.A. sec. 182d. No obstante, dicha exención quedará sin efecto en caso de una epidemia declarada por el Departamento de Salud. *Íd*.

Nicoleau, *supra*; The Stamford Hospital v. Vega, *supra*.[14]
Así, nos parecen acertadas las expresiones del máximo foro
judicial de New York, al indicar que "Los ciudadanos de este
estado han tenido por mucho tiempo el derecho de tomar sus
propias decisiones sobre su cuidado médico sin sujeción a su
condición física o su condición de padres". (Traducción
nuestra). Fosmire v. Nicoleau, *supra*, pág. 883.

Por otra parte, según se ha resuelto en varias
jurisdicciones estatales, el derecho de un paciente de
rechazar cierto tratamiento médico no puede estar limitado a
aquellos pacientes que padecen una condición o estado
particular. Por el contrario, dicha protección
constitucional cobija a toda persona adulta competente que,
consciente de las consecuencias médicas de su rechazo al
tratamiento en cuestión, ha expresado su voluntad al
respecto y esa voluntad puede ser probada con evidencia
clara y convincente. In re Matter of Patricia Dubreuil,
*supra*, pág. 832; Fosmire v. Nicoleau*, supra,* págs. 879-882.
Véase, además, Wendland v. Wendland, 28 P.3d 151 (Cal.,
2001).

Luego de examinar los preceptos constitucionales
pertinentes, así como la forma en que la jurisprudencia
federal y estatal ha atendido controversias similares a la
de autos, resumimos la normativa aplicable. Como
mencionamos anteriormente, a tenor de nuestra

---

[14] En el caso de Dubreuil, el tribunal resolvió que no
se podía presumir el abandono y que, en ese caso particular,
no se presentó prueba clara y convincente de que nadie más
podría hacerse cargo de los menores. In re Matter of
Patricia Dubreuil, *supra*, págs. 824-828. Véase, además,
Public Health Trust County v. Wons, 541 So.2d 96 (Fla.,
1989).

jurisprudencia, el derecho de intimidad consagrado en la Constitución de Puerto Rico protege la inviolabilidad del cuerpo humano y el derecho de las personas a tomar decisiones respecto a éste, particularmente su derecho a decidir sobre su tratamiento médico. Véanse, e.g., Santiago Otero v. Méndez, *supra*, pág. 557 n. 24; Montes v. Fondo del Seguro del Estado, *supra*, págs. 203-04. Este derecho de aceptar o rechazar tratamiento médico ha sido reconocido especialmente en el contexto de la doctrina del consentimiento informado. Además, el derecho de libertad de culto protegido constitucionalmente provee una salvaguarda adicional a aquellas personas cuyo rechazo de determinado tratamiento médico se base en creencias religiosas o cuestiones de fe.

De otra parte, la Constitución de Estados Unidos –según interpretada por el Tribunal Supremo Federal en Cruzan y su progenie– garantiza el derecho constitucional de todo paciente de rechazar tratamiento médico, siempre que la decisión sea informada y el paciente sea consciente de sus posibles consecuencias. De tratarse de un paciente incompetente, se puede requerir que se presente prueba clara y convincente de que su voluntad hubiese sido rechazar el tratamiento médico.

Como se desprende del análisis que precede, los tribunales estatales han seguido consistentemente dicha norma y han protegido el derecho de un paciente de rechazar transfusiones de sangre por razones religiosas. De esta forma, dichos foros han resuelto que al evaluar controversias sobre el rechazo de tratamiento médico, los

tribunales deben tener como norte el respeto de la voluntad expresada por el paciente. Ello es así, incluso en aquellos casos en que la persona está inconsciente o no puede comunicarse, y quien recurre al tribunal es un mandatario o subrogado del paciente o sus familiares. Como consecuencia de lo anterior, ni un subrogado, ni un familiar de un paciente pueden rechazar o consentir la administración de cierto tratamiento médico si no presentan prueba de que esa hubiese sido la voluntad del paciente en tales circunstancias.

Ahora bien, en vista de que ningún derecho es absoluto, se ha resuelto que, una vez se determine la voluntad del paciente, el tribunal debe sopesar el derecho de dicha persona de rechazar tratamiento médico frente a ciertos intereses apremiantes del Estado. La jurisprudencia examinada sugiere que, en la mayoría de las ocasiones, el balance de dichos intereses frente al derecho constitucional de un paciente de rechazar tratamiento favorecerá a este último.

IV.

Cónsono con el derecho constitucional antes expuesto, y en atención al derecho de todo paciente de decidir respecto a cualquier tratamiento médico que ha de serle administrado, la Asamblea Legislativa de Puerto Rico aprobó la Carta de Derechos y Responsabilidades del Paciente, Ley Núm. 194 de 25 de agosto de 2000, 24 L.P.R.A. sec. 3041 *et seq*. (Ley Núm. 194). Dicha ley reconoce el derecho de todo paciente a participar plenamente de las decisiones relacionadas con su salud y cuidado médico. En lo concerniente a la controversia de autos, el referido estatuto establece que todo paciente podrá prestar su consentimiento para aceptar o rechazar tratamiento médico, así como manifestar su preferencia sobre algún tratamiento en particular en caso de que en determinado momento pierda la capacidad de expresar válidamente su consentimiento. Art. 9 de la Ley Núm. 194, 24 L.P.R.A. sec. 3047.

Además, la Ley Núm. 194 le impone a todo médico o profesional de la salud el deber de informar a sus pacientes sobre los derechos garantizados por dicha legislación, lo que según el estatuto incluye la opción de rechazar tratamiento. Art. 9 (a) y (b) de la Ley Núm. 194, *supra*. Según dicha ley, todo médico o profesional de la salud está obligado a respetar y acatar las decisiones y preferencias expresadas por sus pacientes con relación a las opciones de tratamiento que se le ha de administrar. Art. 9 (d) de la Ley Núm. 194, *supra*.

De igual forma, la referida legislación reconoce el derecho de todo paciente que no se encuentre en condiciones

de participar plenamente de las decisiones relacionadas con su cuidado médico a estar representado en la toma de dichas decisiones por su padre, madre, tutor, custodio, encargado, cónyuge, pariente, representante legal, apoderado o cualquier persona designada por los tribunales. La ley también reconoce el derecho de un paciente a usar directrices o guías adelantadas, así como poderes o testamentos vitales (*living wills*) en relación con su tratamiento, o designar a una persona para que tome decisiones sobre tratamiento médico en su nombre cuando sea necesario. Art. 9 (a) y (c) de la Ley Núm. 194, *supra*. Ello sin sujeción al padecimiento de alguna condición médica en particular.

Posteriormente, y en reconocimiento del derecho constitucional de aceptar o rechazar tratamiento médico, la Asamblea Legislativa aprobó la Ley Núm. 160, *supra*, con el propósito de viabilizar el mecanismo de las declaraciones previas de voluntad y establecer los requisitos necesarios para su validez en casos particulares. Véase Exposición de Motivos, Ley Núm. 160, *supra*. Dicho estatuto dispone que cualquier persona mayor de edad y en pleno disfrute de sus facultades mentales puede expresar en cualquier momento su voluntad anticipada sobre el tratamiento médico que deberá serle o no serle administrado en caso de sufrir una condición de salud terminal o estado vegetativo persistente. Art. 3 de la Ley Núm. 160, 24 L.P.R.A. sec. 3652. Esta legislación provee para que las personas puedan otorgar declaraciones de voluntad siempre que se cumplan ciertos requisitos específicos, que incluyen un juramento tomado

ante notario. Art. 4 de la Ley Núm. 160, 24 L.P.R.A. sec. 3653. Según la ley lo define, el tratamiento médico sobre el cual podrá disponerse en la declaración es cualquier tipo de tratamiento, procedimiento o intervención médica que se realiza a una persona para sostener, restaurar o implantar sus funciones vitales, cuando se administra con el único potencial de prolongar artificialmente el momento de la muerte. Art. 2 de la Ley Núm. 160, 24 L.P.R.A. sec. 3651.

Por último, el Artículo 3 de la Ley Núm. 160 dispone que la declaración de voluntad podrá incluir la designación de un mandatario que tome decisiones sobre aceptación o rechazo de tratamiento en caso de que el declarante no pueda comunicarse por sí mismo. 24 L.P.R.A. sec. 3652. En caso de que no se designe un mandatario, se considerará como tal al pariente mayor de edad más próximo según indique el orden sucesoral del Código Civil, considerándose en primer lugar al cónyuge. *Íd*. No obstante, en el artículo 6 del estatuto se establece que la declaración de voluntad sólo será ejecutable una vez al declarante se le diagnostique una condición de salud terminal o se encuentre en estado vegetativo persistente. 24 L.P.R.A. sec. 3655.

Con estos preceptos en mente, pasemos a disponer concretamente de la controversia ante nuestra consideración.

V.

El señor Hernández Laboy suscribió un documento ante notario en el cual, por razones religiosas, rechazó de manera absoluta —y sin sujeción a condición de salud alguna— cualquier tratamiento médico que involucrara transfusiones de sangre. Asimismo, nombró al señor Tirado Flecha como su

mandatario para que velara por que su voluntad se cumpliera en caso de no poder comunicarla él mismo. Los hechos ocurridos con posterioridad al otorgamiento de dicho documento nos obligan a interpretar el alcance de la Ley Núm. 160 y la validez de la declaración firmada por el señor Hernández Laboy.

A.

De entrada, debemos considerar la facultad del mandatario de acudir a los foros judiciales para hacer valer la voluntad expresada por su mandante. Ello, en vista de que el Tribunal de Apelaciones resolvió que el señor Tirado Flecha carecía de legitimación activa, pues, según su interpretación de la Ley Núm. 160, éste no podía acudir a los foros judiciales a reclamar a nombre del señor Hernández Laboy hasta tanto existiera un diagnóstico de condición de salud terminal o estado vegetativo persistente, lo cual no había ocurrido en el caso de autos. La conclusión de dicho foro se basó en el Artículo 6 de la Ley Núm. 160, *supra*, el cual, como hemos indicado, dispone que la declaración será ejecutable una vez se realice el referido diagnóstico. 24 L.P.R.A. sec. 3655.

El concepto de legitimación activa se ha definido, en general, como la capacidad del demandante para realizar con eficacia actos procesales como parte litigante. Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559, 563 (1989). Para determinar si una parte tiene legitimación activa, debe cumplir con los siguientes requisitos: 1) haber sufrido un daño claro y palpable; 2) que el referido daño sea real, inmediato y preciso, y no abstracto o hipotético;

3) una conexión entre el daño sufrido y la causa de acción ejercitada; y 4) que la causa de acción surja bajo el palio de la Constitución o de una ley. Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327, 331 (2000); Asoc. Maestros P.R. v. Srio. Educación, 137 DP.R. 528, 535 (1994).

En el caso de autos el señor Tirado Flecha fue designado por el señor Hernández Laboy como su mandatario para hacer valer su voluntad en caso de que estuviera impedido de comunicarse por sí mismo, sin precisar condición alguna. Específicamente, el señor Hernández Laboy hizo constar en el documento de declaración previa de voluntad que "[o]torgo a mi mandatario pleno poder y autoridad para asegurarse de que el personal médico obedezca las decisiones expresadas en el presente documento y que mi atención médica esté de acuerdo con mis valores y creencias. **La autoridad de mi mandatario entrará en vigor mientras yo me halle incapacitado para tomar mis propias decisiones respecto a la atención médica**". (Énfasis suplido). Conforme a ese mandato, lo que busca vindicar el señor Tirado Flecha son los derechos que hubiese reclamado su mandante, quien, indiscutiblemente, tenía legitimación activa para reclamar sus propios derechos constitucionales, mas se encontraba impedido de hacerlo debido a su estado de salud. Es en ese momento, precisamente, en que se activa la función del mandatario.[15]

Por otro lado, el señor Tirado Flecha no solicitó tomar decisiones a nombre del señor Hernández Laboy, pues éste ya

---

[15] Similar lenguaje utilizó la Asamblea Legislativa al expresar que "Las obligaciones del mandato se activan, luego de ocurrida la incapacidad de facto". Exposición de Motivos, Ley Núm. 160.

había plasmado sus deseos en el documento mencionado. Su única función era asegurarse que se cumpliera la voluntad previamente expresada del paciente. Precisamente, los mandatarios o subrogados no son más que una herramienta adicional para garantizar que la voluntad de un paciente de rechazar o consentir tratamiento médico sea respetada, aun cuando éste se encuentre en un estado de inconsciencia o no pueda comunicarse por sí mismo. Además, existe una diferencia entre tomar decisiones *por* una persona incompetente y hacerlo *a nombre* de ésta. Véase, <u>Cruzan v. Director, Missouri Dept. of Health</u>, *supra*, pág. 287 n. 12. En el caso de autos, el señor Tirado Flecha interesaba rechazar la transfusión de sangre a nombre del señor Hernández Laboy, según éste lo había solicitado en el documento suscrito.

Por lo tanto, y a pesar de que más adelante examinaremos la validez del documento en el que se realizó la designación de mandatario, resolvemos que no nos encontramos ante una situación de falta de legitimación activa, sino ante un reclamo judicial para hacer cumplir la voluntad dispuesta por un ciudadano que no puede comunicarse por sí mismo y ha designado a una persona específicamente para atender esa situación. Negarle al señor Hernández Laboy dicha garantía equivaldría a una violación de su derecho constitucional de rechazar tratamiento médico, pues era la única forma práctica para éste hacer valer su voluntad. Por tal razón, concluimos que el foro apelativo erró al resolver que el

señor Tirado Flecha no tenía legitimación activa y, a base de ello, desestimar el presente recurso.[16]

                                    B.

Según discutiéramos anteriormente, la Ley Núm. 160 dispone que el tipo de declaración anticipada allí contemplada, la cual puede incluir la designación de un mandatario para que haga valer la voluntad del paciente, será ejecutable cuando al declarante se le diagnostique una enfermedad terminal o un estado vegetativo persistente que le impida comunicarse por sí mismo. Véanse Art. 3 y Art. 6 de la Ley Núm. 160, 24 L.P.R.A. secs. 3652 y 3655. Es decir, dicha legislación regula específicamente las declaraciones de voluntad de un paciente que se encuentra en las circunstancias allí descritas y, por tanto, no contempla que un paciente que no ha sido diagnosticado con alguna de las condiciones mencionadas pueda rechazar válidamente determinado tratamiento médico mediante una declaración previa de voluntad.

Sabido es que la acción legislativa lleva consigo una presunción de constitucionalidad. E.L.A. v. Aguayo, *supra*, pág. 597. Por ello, los tribunales debemos intentar lograr una interpretación de la ley que preserve la constitucionalidad de ésta. Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990). Véase, además, R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da ed. Rev., San Juan, Pubs. J.T.S., 1987,

_____

[16] Al resolver que el señor Tirado Flecha posee legitimación activa para impugnar el dictamen del tribunal de instancia, no estimamos necesario pronunciarnos sobre la legitimación activa de la Congregación de los Testigos de Jehová.

Vol. 1, págs. 327-29. No obstante, y en vista de que la Ley Núm. 160 incide sobre el derecho constitucional y estatutariamente protegido de un ciudadano de expresar su voluntad respecto a la aceptación o rechazo de determinado tratamiento médico, es menester examinar si dicha ley es cónsona con el derecho constitucional.

A tenor del derecho de intimidad consagrado en nuestra Constitución y del interés libertario protegido por el debido proceso de ley, todo paciente tiene derecho de tomar decisiones sobre su tratamiento médico. Ello incluye el derecho de aceptar o rechazar determinado curso de acción relacionado con su cuidado médico, sin sujeción a diagnósticos particulares o condiciones específicas, aun cuando dicho rechazo pudiese resultar en la muerte de la persona.

A la luz de estos preceptos, al limitar la declaración de voluntad del paciente a situaciones en que exista un diagnóstico de condición de salud terminal o estado vegetativo persistente, la Ley Núm. 160 vulnera el derecho constitucionalmente protegido de tomar decisiones respecto a su cuerpo. Sin embargo, el propósito de ésta no fue limitar el derecho de rechazar tratamiento médico, sino proveer un mecanismo formal -la declaración previa de voluntad- para hacer valer los deseos del paciente. Véase Exposición de Motivos, Ley Núm. 160, *supra*. Ello es cónsono con lo resuelto en Cruzan, *supra*, relativo a la validez del requisito estatal de evidencia clara y convincente sobre la voluntad del paciente.

No obstante, al imponer el Artículo 6 un límite a la voluntad de las personas y sujetar su efectividad a los diagnósticos particulares contenidos en dicha disposición, éste adolece de inconstitucionalidad.[17] Limitar nuestra interpretación a una mera lectura y aplicación literal del texto allí plasmado equivaldría a renunciar a nuestra máxima función constitucional e imponer un estrecho marco a la voluntad de todo aquel que no padezca alguno de los dos diagnósticos especificados en la ley. Por ende, resolvemos que el mecanismo de la declaración previa de voluntad regulado no puede estar limitado a las dos instancias contenidas en la ley, sino que debe estar disponible para toda persona mayor de edad y competente que desee manifestar su voluntad de rechazar tratamiento médico. Claro está, si surgiera alguna controversia respecto a la validez o autenticidad del medio utilizado por el declarante para hacer constar su voluntad, se trataría entonces de un asunto de derecho probatorio a ser dirimido por un tribunal competente. Ello, sin embargo, sería un asunto colateral a la voluntad propiamente expresada.

Conforme al derecho antes expuesto, aun en el supuesto de que concluyéramos que la declaración otorgada por el señor Hernández Laboy —en la cual no limitó su rechazo de las transfusiones de sangre a padecer de una enfermedad terminal o encontrarse en un estado vegetativo persistente— no cumplió con los requisitos dispuestos en la Ley Núm. 160,

_____

[17] Cabe señalar que el Artículo 15 de la Ley Núm. 160, *supra*, dispone que "[e]n caso de que un tribunal declarare alguna disposición de esta ley nula, ineficaz o inconstitucional, dicha determinación no afectará las restantes disposiciones de la misma".

su voluntad no queda desprovista de protección legal. Por el contrario, su derecho de rechazar transfusiones de sangre sin sujeción a un diagnóstico en particular, y de designar a una persona para que hiciera valer su voluntad en caso de no poder comunicarse por sí mismo, está garantizado por el derecho constitucional federal y puertorriqueño.

De esta forma -incluso en ausencia de una declaración previa de voluntad o designación de mandatario- la voluntad de un paciente de rechazar tratamiento médico debe ser respetada. En tales casos, el Tribunal Supremo de Estados Unidos determinó que sería válido exigir que dicha voluntad se demuestre mediante prueba clara y convincente. Cruzan v. Director, Missouri Dept. of Health, *supra*. Lo anterior sólo debe estar sujeto a un balance entre la voluntad del paciente y los intereses apremiantes que pudiera tener el Estado en impedir que se cumpla dicha voluntad.

En el caso de autos, el Tribunal de Primera Instancia correctamente admitió como válido el documento presentado por el señor Tirado Flecha en el que se hacía constar la voluntad del señor Hernández Laboy de rechazar transfusiones de sangre en toda circunstancia. Por tal razón, y cónsono con la jurisprudencia antes citada, el tribunal realizó un balance entre el derecho del señor Hernández Laboy a rechazar tratamiento médico y los intereses del Estado en intervenir con dicha decisión. En este caso, el interés reclamado era proteger al hijo menor de edad de las partes y evitar que sufriera un abandono en el supuesto de la muerte de su padre.

Tras escuchar los argumentos de las partes, el foro de instancia determinó que la señora Lozada Tirado no podía hacerse cargo del niño por sí sola. El tribunal se basó en que, supuestamente, la señora Lozada Tirado era una persona de "escasos recursos económicos" y con "una capacidad intelectual baja". En atención a lo anterior, resolvió que la muerte del señor Hernández Laboy dejaría a su hijo en un estado de abandono, por lo que el Estado tenía un interés apremiante en obligarlo a recibir sangre y así, según el tribunal, evitar su muerte. De esta forma, el foro judicial concedió la solicitud de la señora Lozada Tirado para que se ordenara al hospital transfundir sangre y dializar al señor Hernández Laboy de ser necesario.

El interés estatal invocado por el tribunal —a pesar de que no hay evidencia de que el Estado compareciera a los procedimientos para reclamarlo— se trata del interés en evitar el abandono de menores de edad, como parte del poder *parens patriae* del Estado.[18] Éste es una vertiente del

---

[18] Resulta pertinente resaltar que los tribunales estatales han negado legitimación a una institución hospitalaria para invocar el interés del Estado en evitar el abandono de los menores y así obligar a un paciente a recibir tratamiento médico en contra de su voluntad. The Stamford Hospital v. Vega, *supra*, pág. 829. De hecho, en algunas jurisdicciones se ha exigido la comparecencia del Estado por medio de un fiscal o procurador para poder dilucidar los méritos de un caso en el que se invoque algún interés del Estado que deba ser sopesado con el derecho constitucional de un paciente adulto de rechazar tratamiento médico. Véase In re Matter of Patricia Dubreuil, *supra*.

En el caso de autos, a pesar de que se trataba del hospital del Estado —representado por ASEM—, su comparecencia no fue a los efectos de representar el interés del Estado en evitar el posible abandono de un menor. De hecho, del expediente surge que la razón por la cual la esposa del señor Hernández Laboy acudió al tribunal a solicitar la orden fue que el hospital se negó a realizar la transfusión, por respeto a los deseos del paciente.

interés en proteger a terceros inocentes, reconocido en la jurisprudencia. Según se desprende del análisis que precede, los foros judiciales han rechazado anteponer dicho interés frente al derecho de rechazar tratamiento médico de un paciente adulto padre de menores de edad, cuando el otro padre o algún familiar del menor podría hacerse cargo de éste en la eventualidad de que el paciente muera. Véanse The Stamford Hospital v. Vega, *supra;* In re Matter of Patricia Dubreuil, *supra;* Norwood Hospital v. Muñoz, *supra.*

Dado que se trata de limitar o anular un derecho constitucional, el análisis de los intereses del Estado no debe tomarse livianamente por los tribunales. Recordemos que en Estados Unidos el derecho de rechazar tratamiento médico se deriva de la doctrina de consentimiento informado del derecho común anglosajón y de la cláusula de debido proceso de ley de la Constitución Federal. Mientras, en nuestra jurisdicción, dicho derecho se reconoce, no sólo como parte de la doctrina de consentimiento informado, sino como parte del derecho de intimidad expresamente garantizado en nuestra Constitución como un derecho fundamental. Por lo tanto, en estos casos, el alegado abandono no puede presumirse, sino que debe probarse con evidencia clara y convincente. Véase In re Matter of Patricia Dubreuil, *supra.* La mera preocupación del Estado por el bienestar del menor no es suficiente. Véase Norwood Hospital v. Muñoz, *supra.*

Según se desprende del expediente del caso ante nuestra consideración, la señora Lozada Tirado no padecía de incapacidad física o mental alguna que le impidiera encargarse de la crianza del menor. Si bien el tribunal

señaló que la señora Lozada Tirado es una persona de "escasos recursos económicos" y "capacidad intelectual baja", ello de por sí no constituye una incapacidad absoluta para continuar cuidando a su hijo menor de edad. Además, no se probó que los hermanos mayores de edad del menor no pudieran ayudar en su crianza, pues el mero hecho de que éstos no vivieran cerca, según surge de la resolución emitida por el Tribunal de Primera Instancia, no impide que la familia pudiera hacer arreglos para manejar la situación.[19] De hecho, la señora Lozada Tirado compareció a la vista acompañada de dos hijas mayores de edad.

Asimismo, el foro de instancia hizo constar en su resolución que los ingresos del núcleo familiar compuesto por el señor Hernández Laboy, su esposa y su hijo menor de edad consistían en los ingresos de la señora Lozada Tirado y los beneficios de seguro social del señor Hernández Laboy. No obstante, el tribunal no tomó en cuenta que el menor podría recibir algunos beneficios del seguro social en la eventualidad de la muerte de su padre.

Por último, el Tribunal de Primera Instancia consideró que el menor podría afectarse emocionalmente por la muerte del señor Hernández Laboy, luego de haber sufrido también la muerte de su padre biológico. Reconocemos que el bienestar emocional y psíquico del menor es importante y amerita preocupación y consideración. Entendemos, sin embargo, que ese factor tampoco es suficiente para soslayar la voluntad

---

[19] Según surge de la resolución emitida por el Tribunal de Primera Instancia, el señor Hernández Laboy y la señora Lozada Tirado habían procreado seis hijos, de los cuales uno -el padre del menor de edad- había fallecido.

firme, expresa y constitucionalmente protegida de un adulto competente de rechazar determinado tratamiento médico.

En suma, consideramos que lo anteriormente expuesto no configura el abandono alegado por la señora Lozada Tirado, por lo que debió prevalecer la voluntad expresada por el señor Hernández Laboy de no recibir sangre en ninguna circunstancia. Por ende, el foro de instancia erró al acceder al pedido de la esposa del señor Hernández Laboy para realizarle una transfusión de sangre, a pesar de que el propio tribunal tuvo ante sí evidencia clara y convincente, mediante el documento de declaración previa de voluntad, del rechazo expreso del señor Hernández Laboy a dicho tratamiento.

Por otro lado, existe otro fundamento constitucional, además de la violación a su derecho de intimidad y a su interés libertario, para validar el documento suscrito por el señor Hernández Laboy y proteger su voluntad expresa. Específicamente en el caso de autos no podemos pasar por alto el hecho de que el rechazo del paciente a las transfusiones de sangre se basó en sus creencias religiosas, por lo que el Artículo 6 de la Ley Núm. 160, en tanto en cuanto condiciona su aplicación solamente a instancias en que el paciente sufra una enfermedad terminal o estado vegetativo persistente, infringe el derecho de libertad de culto del señor Hernández Laboy, según protegido tanto por la Constitución de Estados Unidos como la Constitución de Puerto Rico. Art. II, sec. 3, Const. E.L.A., *supra;* 1ra Enm., Const. E.E.U.U., *supra.* A pesar de que la Ley Núm. 160 es una ley neutral y de aplicabilidad general, ésta

impone, mediante el Artículo 6, una carga sobre la práctica religiosa del señor Hernández Laboy. Por lo tanto, sería necesario que el Estado hiciera una concesión para permitir el libre ejercicio de su religión.

No obstante, como hemos explicado, los límites impuestos por dicho estatuto infringen el derecho de intimidad y libertad individual, por lo que éstos no pueden sostenerse, aun en ausencia de un planteamiento de libertad de culto. En estos casos particulares, se ha resuelto que el derecho de intimidad del paciente coexiste y se entrelaza con su derecho de libertad de culto para proteger su decisión. In re Matter of Patricia Dubreuil, *supra*, pág. 822.

Conforme a lo anterior, el rechazo de tratamiento médico como parte de una objeción de conciencia o por motivos religiosos debe ser respetado en toda persona que goce de sano juicio, a menos que en su ejercicio se cause grave daño a la vida de terceras personas. Es nuestro criterio que la evaluación del rechazo de un paciente a cierto tratamiento médico por razones religiosas o de conciencia, no debe basarse en un juicio subjetivo sobre dicha conducta, sino en el respeto a la dignidad humana y a la libertad individual y de culto de esa persona, la cual sólo podría verse limitada por un interés mayor del Estado.

En el caso específico del señor Hernández Laboy, su rechazo de las transfusiones de sangre no respondía a su desprecio por la vida, sino a su apego a una vida acorde con los postulados de su fe. Según surge del expediente, para los Testigos de Jehová el rechazo a recibir sangre -en toda circunstancia y sin sujeción a condición médica alguna- es

un principio medular de su religión.[20] Por tal razón, el Artículo 6 de la Ley Núm. 160, según aplicado por los foros *a quo*, impone una carga sustancial injustificada a las prácticas religiosas del señor Hernández Laboy que infringió su derecho constitucional a la libertad de culto.

En fin, en el día de hoy resolvemos que, tanto la Constitución del Estado Libre Asociado de Puerto Rico como la Constitución de Estados Unidos protegen el derecho de las personas a rechazar tratamiento médico, aun cuando su decisión acarree consecuencias fatales para su vida. Esto, en virtud del principio de la inviolabilidad de la dignidad del ser humano y del derecho de intimidad consagrados en nuestra Constitución, así como del derecho de libertad protegido por el debido proceso de ley y el derecho de libertad de culto plasmados tanto en nuestra Constitución como en la de Estados Unidos. Tales derechos cobijan también la facultad de expresar esa voluntad anticipadamente. En ese sentido, sujetar la voluntad expresada por un ciudadano a las dos condiciones específicamente dispuestas en el Artículo 6 de la Ley Núm. 160 infringe las más fundamentales libertades constitucionales de cada ser humano, más aún cuando se trata de un rechazo a determinado tratamiento por razones

---

[20] Cabe señalar que del historial legislativo de la Ley Núm. 160, *supra*, surge que otros grupos religiosos mostraron preocupación con que se restringiera la ejecutabilidad de las declaraciones anticipadas de voluntad a un estado de permanente inconsciencia, aun cuando una persona que no estuviera en tal condición rechazara algún tratamiento médico conforme a sus valores y creencias. Véase Ponencia del Profesor de Teología Moral y Bioética, Jorge J. Ferrer, quien declaró ante la Comisión de lo Jurídico del Senado a nombre de la Federación Puertorriqueña de Bioética y de la Arquidiócesis Católica de San Juan.

religiosas. Por ello, a pesar de reconocer la validez de las declaraciones previas de voluntad —y sin prejuzgar cualquier otra controversia que pudiera surgir al amparo de la referida ley—, sostenemos que las protecciones constitucionales aplicables operan más allá de los límites dispuestos en el Artículo 6 de la Ley Núm. 160, sujeto a que se demuestre cuál hubiese sido la decisión del paciente y al balance de aquellos intereses apremiantes que pudiera invocar el Estado.

## VI.

Por los fundamentos antes expuestos, revocamos la resolución del Tribunal de Apelaciones.

Se dictará sentencia de conformidad.


Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luz E. Lozada Tirado,
Andrea Hernández Lozada,
y Otros

   Recurridos

    v.                         CC-2006-94       Certiorari

Roberto Tirado Flecha y la
Congregación Cristiana de los
Testigos de Jehová de
Puerto Rico, Inc.

   Peticionarios

SENTENCIA

San Juan, Puerto Rico a 27 de enero de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la resolución del Tribunal de Apelaciones.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión de Conformidad. La Jueza Asociada señora Pabón Charneco disiente con opinión escrita a la que se une el Juez Asociado señor Martínez Torres. El Juez Asociado señor Rivera Pérez disiente sin opinión escrita.

                                Aida Ileana Oquendo Graulau
                             Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Luz E. Lozada Tirado, Andrea Hernández Lozada, Elizabeth Hernández Lozada y Luis Damián Hernández Lozada<br><br>Recurridos– Ex parte<br><br>v.<br><br>Roberto Tirado Flecha y la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc.<br><br>Peticionarios | CC-2006-94 |
| --- | --- |

Opinión de conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 27 de enero de 2010

> "The only part of the conduct on anyone, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself over his own body and mind, the individual is sovereign."
>
> John Stuart Mill, *On Liberty*

Creo que toda persona adulta con plena capacidad para obrar tiene un derecho a rehusar tratamiento médico aun cuando tal curso de acción pueda conllevar, como consecuencia natural, su muerte. Ello, como manifestación del componente de libertad de la cláusula de debido proceso de ley, o como afirmación de su autonomía en la toma de decisiones personales conforme el derecho a la intimidad y

a la inviolabilidad de la dignidad del ser humano. Porque entiendo que la Constitución del Estado Libre Asociado de Puerto Rico reconoce este derecho, estoy conforme con la determinación que hoy anuncia este Tribunal.

I

El señor Víctor Hernández Laboy, otorgó una declaración de voluntad al amparo de la Ley Núm. 160 de 17 de noviembre de 2001,[21] mediante la cual designó como mandatario al señor Roberto Tirado y expresó su rechazo a transfusiones de sangre o a que se prolongara su vida en caso de estar desahuciado. Un año después, Hernández sufrió un accidente automovilístico que provocó su reclusión en la Unidad de Trauma Intensivo de Centro Médico. La señora Luz Lozada, esposa del declarante, acudió al Tribunal de Primera Instancia y solicitó que se le transfundiera sangre. El tribunal, mediante orden *ex parte,* dispuso que se realizara la transfusión así como otros procedimientos que fuesen necesarios para preservar la vida del declarante.

El Centro Médico no puso en vigor la orden porque el señor Tirado se opuso a su ejecución tras presentar la declaración de voluntad del señor Hernández. La señora Lozada junto a los hijos del declarante acudieron nuevamente al tribunal. Solicitaron que se ordenara la transfusión de sangre o dializar al declarante si así lo requería su condición. El tribunal emitió una orden según

---

[21] 24 L.P.R.A. sec. 3651 *et. seq.*

lo solicitado.[22] Posteriormente, se celebró una vista en la cual el señor Tirado arguyó que era el mandatario del señor Hernández y que la orden emitida constituía una violación al derecho a la libertad de culto e intimidad del declarante. El tribunal decidió mantener en vigor la orden. Transcurridos varios días, y luego de una transfusión de sangre, el señor Hernández falleció.

El señor Tirado y la Congregación de los Testigos de Jehová, de la cual era feligrés el declarante, acudieron al Tribunal de Apelaciones. Este foro determinó que ambos carecían de legitimación activa. Resolvió que el señor Tirado no probó que la declaración de voluntad era ejecutable toda vez que no demostró que el declarante estuviese en estado vegetativo persistente o condición terminal de salud. Asimismo, sostuvo que la Congregación carecía de legitimación activa pues no fue parte en el tribunal de instancia. Inconformes, acudieron ante este foro la Congregación y el señor Tirado.

II

Los adelantos científicos y tecnológicos de las últimas décadas han posibilitado la extensión cuasi artificial de la vida, y lo han hecho a unos límites que nos resultan cada vez más sorprendentes. Prolongando la

---

[22] El Tribunal de Primera Instancia estimó que existía un interés particular que justificaba ordenar la transfusión de sangre al señor Hernández Laboy incluso en contra de su voluntad declarada. Estimó dicho foro como una razón válida para emitir la orden el hecho de que el declarante tenía un hijo menor que dependía de él para su sustento. No obstante, en consideración a la voluntad del declarante, precisó el foro de instancia que la transfusión sólo procedería como último recurso.

vida más allá de su propia muerte y viabilizando que una persona permanezca en un estado crepuscular de "posvida y antemuerte".[23]    Fueron, precisamente, esos desarrollos tecnológicos, "que causaban una creciente dificultad en la toma de decisiones cientificomédicas [lo que] dio lugar al nacimiento de la bioética." N. Casellas Caralt, Orígenes, desarrollo y problemas actuales de la bioética: Una breve introducción, 76 *Rev. Jur. U.P.R.* 1115, 1116 (2007). Disciplina ésta que examina "las dimensiones éticas de las actuaciones humanas […] en las ciencias de la vida en toda su amplitud […], con la finalidad de facilitar la toma de decisiones…." *Ibid*, pág. 1118.

La figura jurídica de las voluntades anticipadas, o el testamento vital, o las directrices anticipadas --todos nombres para una misma figura-- se ha categorizado como un mecanismo de autodefensa del paciente frente al llamado "encarnizamiento terapéutico" de la medicina. A. Andruet, Breve Exégesis del Llamado 'Testamento Vital', www.ajs.es/downloads/vol10025.pdf. Naturalmente, este es un tema que encierra una realidad compleja donde entrelazan valores jurídicos, filosóficos y éticos con valores asistenciales y médicos, no siempre en total armonía. Véase, Casellas Caralt, *op. cit.*, págs. 1118-1119. Lo cierto es, que el testamento vital lo que pretende es

---

[23] La expresión antes mencionada, la tomo prestada de la ponencia del Dr. José Rafael Echevarría, Catedrático de Filosofía y Bioética, quien depuso a nombre de la Federación Puertorriqueña de Bioética, ante la Comisión de lo Jurídico del Senado de Puerto Rico en ocasión de la discusión del P. de la C. 386, que se convirtió en la Ley núm. 160.

regular el consentimiento informado en una etapa vital determinada. *Íbid.* El profesor Pedro Silva Ruiz, define esta figura jurídica de la siguiente forma: "[E]l testamento vital es una orden escrita dada por un individuo, mientras se encuentra en el ejercicio de sus facultades mentales, indicativa del tratamiento médico que quisiera recibir en el momento en que, como paciente se encuentre incapacitado […] para tomar decisiones." P. Silva Ruiz, El Derecho a morir con dignidad y el testamento vital, *Revista General de Derecho,* Núms. 592-593, 425, 435 (1994).

El profesor Gonzalo Herranz, de otra parte, nos indica que la introducción de esta figura "no sólo está enriqueciendo los contenidos y el estilo de la deontología profesional de médicos y enfermeras, sino que está dando una nueva tonalidad al modo de asistir y tratar a los pacientes, de respetarlos en cuanto seres humanos en la circunstancia específica en la que ellos ya no son capaces de llevar el timón de su propia existencia." G. Herranz, Voluntades anticipadas y testamento vital, *Informaciones Psiquiátricas*, Primer y segundo trimestres 2005, número 179-180, pág. 41, disponible en www.revistahospitalarias.org/info_2005/01_179_05.htm. Véase además, Carlos María Romeo Casabona (dir.), *La ética y el derecho ante la biomedicina del futuro*, Universidad de Deusto, Bilbao, 2006, capt. 3.

Las voluntades anticipadas o el llamado testamento vital responden al ideario de afirmación de la autonomía de

la voluntad.  L. Requero Ibañez, El Testamento Vital y las Voluntades Anticipadas:   Aproximación al ordenamiento español, 4 *La Ley,* 2002, pág. 1899;  Herranz, *op. cit.* Valor que se configura como "uno de los principios fundamentales en la ética biomédica …. Prescribiendo que 'las acciones y las elecciones autónomas no deben ser constreñidas por los demás'."  J. Sanllehí, A vueltas con el principio de autonomía, en M. Casado (comp.), *Estudios de Bioética y Derecho*, Tirant lo Blanch, Valencia, 2000, pág. 101.  En este tenor, la profesora Casellas Caralt nos indica que "[c]uando en la reflexión bioética se hace referencia al principio de la autonomía, se habla de libertad, '[e]l valor de la autonomía, como capacidad de tomar decisiones por uno mismo, no sería más que una forma de manifestación de la libertad, y de justicia con igualdad, que tiene 'en el campo de la sanidad una aplicación importantísima'."  (Notas al calce omitidas.) Casellas Caralt, *op. cit.*, pág. 1140.

La Magistrada Aída Kemelmajer de Carlucci, en ocasión de celebrarse en Puerto Rico el XIV Congreso Internacional de Derecho de Familia, abordó el tema de las voluntades anticipadas.  En su ponencia apuntó que la autonomía de la voluntad, "es la finalidad de las directivas anticipadas; **su objetivo sería reforzar la autonomía del paciente y garantizarle un efectivo y pleno ejercicio de su derecho personalísimo.**"  (Énfasis nuestro.)  A. Kemelmajer de Carlucci, Interacción del Derecho de Familia con otras Áreas del Derecho: Las Voluntades Anticipadas: Una Apertura

a favor del Reconocimiento de la Autonomía de la Voluntad para Expresar Decisiones Bioéticas, 41 *Rev. Jur. U.I.P.R.* 135, 157 (2006). Reconoce, que "hay consenso en que el cuidado de la salud propia, cuando la conducta descuidada no compromete a terceros, se recluye en el ámbito de la privacidad. La conducta es autorreferente; es decir, se refiere exclusivamente a la persona que cuida o descuida su salud. **Dicho en otras palabras, la salud propia, en tanto no altera la de los terceros, entra en el ámbito de la autonomía de la voluntad.**" (Énfasis nuestro.) *Íbid,* pág. 156.

Como hemos indicado, las voluntades anticipadas recogen la expresión del individuo, quien, desde su intimidad, deja predeterminado para el caso de enfermedad o accidente, su deseo sobre los tratamientos que quiere que se le apliquen. Debemos tener presente que habrá quien entienda que "el derecho a la vida no puede reducirse a la mera subsistencia, sino que implica el vivir adecuadamente en condiciones de dignidad", y esta figura jurídica ofrece un vehículo para concretizar su voluntad o su deseo íntimo sobre cómo conducir su vida. A. Valencia Zea, A. Ortiz Monsalve, *Derecho Civil, Parte general y personas*, Ed. Temis, Decimosexta edición, Bogotá, 2006, Tomo I, pág. 430.[24]

---

[24] En este tenor, son relevantes las siguientes reflexiones del profesor Andreu García Aznar: "es posible interpretar, en el contexto de una sociedad plural, que el derecho a la vida es un derecho a que no nos la quiten y a que no nos obliguen a vivirla en contra de nuestras creencias si ello no perjudica a terceros y aunque tal decisión no sea acorde

Estos fundamentos que le sirven de soporte, como sabemos, animan también el consentimiento informado que todo médico requiere de un paciente previo a someterlo a tratamiento, por lo que se les ha catalogado como variación de éste. Requero Ibañez, *op. cit.*, pág., 1900. El consentimiento informado es el derecho a la información que tiene el paciente a ser informado y, en respuesta a la información que recibe, dar su aprobación. Es así, la manifestación libre, consciente e inequívoca de la voluntad del paciente. M. Galán Juárez, *Intimidad Nuevas dimensiones de un viejo derecho*, Editorial universitaria Ramón Areces, Madrid, 2004, págs. 240-242. La diferencia con las voluntades anticipadas es entonces, que en estos casos el requerimiento no fluye del médico al paciente sino de éste último al primero. Al fin y a la postre, como consentimiento anticipado que es, "su fin es suplir el consentimiento informado cuando las circunstancias no permitan al paciente expresar personalmente su voluntad." Requero Ibañez, *op. cit.*, pág. 1901. Adviértase también que el derecho a consentir lleva implícito el derecho a rechazar.

---

con la mayoría de la población. Visto así el derecho a la vida sería vivir de acuerdo con nuestras creencias y nuestras dudas, nuestras afirmaciones y nuestras contradicciones, nuestras ilusiones y nuestros pesares, avanzando y retrocediendo y eligiendo en libertad aquello que deseamos. Ese deseo a vivir de ese modo no estaría por encima del derecho de otros a vivir de otra forma, no pudiéndonos adjudicar el derecho a que otras personas viva o mueran, por nuestras creencias." A. García Aznar, Sobre el respeto a la autonomía de los pacientes, en M. Casado (comp.), *Estudios de Bioética y Derecho*, Tirant lo Blanch, Valencia, 2000, pág. 209.

Recapitulando, la figura jurídica de las voluntades anticipadas o testamento vital tiene como fundamento el valor de la dignidad humana, de la autonomía y del derecho de toda persona a la autodeterminación; además de ser una modalidad del principio del consentimiento informado. Considero entonces que al contextualizar la ley que las regula, debemos adelantar el fundamento que les sirve de puntal. Ello, porque entiendo que cualquier aproximación al tema que nos ocupa nos impone, en correcta metodología adjudicativa, no sólo interpretar o ponderar el contenido y estructura jurídica de la norma regulada, sino más que nada, qué hay detrás de ésta, qué bien jurídico pretende tutelar, a quién va destinada y porqué tiene un contenido y no otro.

III

En *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977), el Tribunal Supremo de Estados Unidos catalogó el principio de la autonomía en la toma de decisiones personales importantes como una de las vertientes del derecho a la intimidad. En este tenor, indicó lo siguiente:

> The cases characterized as protecting privacy have in fact involved two different kinds on interests. One is the individual interest in avoiding disclosures of personal matters, **and another is the interest in independence in making certain kind of important decisions.** (Énfasis nuestro. Escolio omitido.)

*Whalen v. Roe, ante,* págs. 598-600. Véanse además, *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972). Antes bien, el componente

sustantivo de libertad de la cláusula de debido proceso de ley de la Constitución de Estados Unidos, se ha perfilado en la doctrina constitucional norteamericana como el vehículo a través del cual se reconduce el análisis de esta modalidad del derecho a la intimidad.  En *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992), reiterado en *Lawrence v. Texas*, 539 U.S. 558, 574 (2003), el Tribunal Supremo lo expresó así:  "At the heart of liberty is the right to define one´s own concept of existence, of meaning, of the universe, and of the mystery of human life.  Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."

Las decisiones personales protegidas por el Tribunal Supremo de Estados Unidos bajo esta cláusula constitucional cubren una miríada de intereses, entre éstos, y en lo que nos atañe, destaca el llamado derecho a una muerte digna.[25] *E.g., Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261 (1990).  En *Cruzan*, en el proceso de validar el estándar de prueba requerido bajo la Constitución de Estados Unidos para determinar si se accede a descontinuar los métodos artificiales de alimentación de una paciente en estado vegetativo permanente, ante la ausencia de una expresión

---

[25] Véase además, Z. Figueroa Berríos, La nutrición e hidratación en los testamentos vitales en Puerto Rico: Imposición de valores por el Estado, 76 *Rev. Jur. U.P.R.* 1271 (2007); P. Cabán Vales, Derecho a la Intimidad:  El Derecho a Morir en el Contexto del Derecho a la Intimidad: Rechazo de Tratamiento Médico Vital, Eutanasia y Suicidio Asistido, 72 *Rev. Jur. U.P.R.* 1139 (2003); T. Medina Monteserín, El Derecho a una Muerte Natural:  Manifestación Última de la Libertad Personal y de la Autonomía Individual, 60 *Rev. Jur. U.P.R. 295* (1991).

concreta y por escrito de ésta, el Tribunal Supremo aseveró que su trayectoria jurisprudencial dejaba establecido que bajo la Constitución de Estados Unidos toda persona tenía un derecho a rechazar tratamiento médico no deseado como exigencia del debido proceso de ley. El Tribunal indicó: "The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." *Íbid,* pág. 278. Véase, E. Chemerinsky, *Constitutional Law Principles and Policies*, Aspen Publishers, 3rd. ed., New York, 2006, pág. 848. ("Generally, there is a constitutional right of individuals to refuse medical treatment.")

Aun antes de *Cruzan*, y evidentemente después, distintas jurisdicciones estatales de Estados Unidos reconocían el derecho de una persona a rechazar tratamiento médico no deseado como una manifestación del ejercicio a la autodeterminación. Valorando, en el proceso, las voluntades anticipadas o el testamento vital como el mecanismo más idóneo para hacer efectiva esa expresión. Consúltese a manera de ilustración, entre otros: *In matter of Quinlan,* 355 A.2d 647 (NJ 1976), *cert denied sub nom Garger v. New Jersey*, 429 U.S. 922 (1977); *In re Dunkan*, 769 A.2d 497 (Pa. 2001); *In re Guardianship of Browning*, 568 So. 4 (Fla. 1990); *In re Martin*, 538 N.W.2d 399 (Mich. 1995); *Rasmussen v. Fleming*, 741 P.2d 647 (Ariz. 1987)(*en banc); Matter of Westchester County Med. Center*, 531 N.E.2d 607 (N.Y. 1988); *Saunders v. State*, 492 N.Y.S.2d 510

(1985); *State v. McAffee*, 385 S.E.2d 579 (Ga. 1989); *Knight v. Beverly Health Car Bay Manor Health Care Ctr.*, 820 So.2d 92 (Ala. 2001); *San Juan Torregrosa v. García*, 80 S.W.3d 539 (Tenn. 2002); *In re Gardner*, 534 A.2d 947 (Me. 1987); *Woods v. Commonwealth*, 142 S.W.3d 24 (Ky. 2004). En *Cruzan,* la Juez O'Connor, en su opinion concurrente al referirse a los testamentos vitales, indicó: "These procedures for surrogate decision-making, which appear to be rapidly gaining in acceptance, may be a valuable additional safeguard of the patient´s interest in directing his medical care." *Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 291-292 (O´Connor, J., op. concurrente).

Pasemos ahora a considerar la situación de las voluntades anticipadas en Puerto Rico, no tan sólo desde el punto de vista estatutario, sino también desde su dimensión constitucional.

IV

La Constitución del Estado Libre Asociado de Puerto Rico garantiza que la dignidad del ser humano es inviolable y que toda persona tiene derecho a la protección contra ataques a su honra, a su reputación y a su vida privada o familiar. Constitución del Estado Libre Asociado, Art. II, secs. 1, 8.[26] El Informe de la Comisión de Carta de Derechos a la Convención Constituyente nos aclara cómo el derecho a

---

[26] Como sabemos, estas secciones provienen de la Declaración Universal de los Derechos del Hombre y la Declaración Americana de los Derechos y Deberes del Hombre, lo que convierte a estas últimas en válidos referentes a la hora de proveerle contexto y contenido a las protecciones que le ofrece nuestra Constitución a los ciudadanos.

la intimidad que recoge nuestra Carta Suprema entrelaza con el valor a la protección de la dignidad humana, el cual subyace, como principio fundamental, el documento constitucional.  En este tenor se indica:

> La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia.  El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra ingerencias (sic) abusivas de las autoridades.  La fórmula propuesta en la sección 8 cubre ambos aspectos.  Complementa constitucionalmente lo dispuesto en la sección 10 y cubre el campo conocido en el derecho norteamericano como el 'right to privacy' particularmente importante en el mundo moderno.

4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 1961, pág. 2566.  El presidente de la Comisión, Dr. Jaime Benítez, al presentar ante el seno de la Convención el Informe de la Comisión, aclaró lo siguiente:  "Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta esta proposición.  Tal vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable.  Esta es la piedra angular y básica de la democracia.  En ella radica su profunda fuerza y vitalidad moral.  Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene todo el orden

constitucional de descansar en ella, protegerla y defenderla." Véase además, 3 J. Trías Monge, *Historia Constitucional de Puerto Rico*, Editorial Universidad de Puerto Rico, Rio Piedras, 1982, págs. 175-176, 189-190.

La dignidad humana se constituye así como punto de referencia o valor jurídico supremo dentro del orden constitucional. Deconstruir su contenido se dificulta mientras no contemos con una definición que sea satisfactoria para todos. No obstante, si bien es "*imposible determinar* de modo satisfactorio *qué* es la dignidad de la persona humana, … sí es *posible* [manifiestamente] fijar *cuándo* se le está vulnerando." (Bastardillas en original.) I. Von Münch, La dignidad del hombre en el Derecho Constitucional, *Revista Española de Derecho Constitucional*, no. 5 mayo-agosto, 1982, 9, 19.

Independientemente de lo indicado, podemos aseverar que la dignidad humana tiene como fundamento la propia libertad y autonomía del individuo. Véase, G. Peces-Barba Martínez, *La Dignidad de la Persona desde la Filosofía del Derecho*, Dykinson, 2003, 2da ed., Madrid, págs. 68-69. Ésta "supone algo más que la mera garantía negativa de que la persona no va a ser objeto de ofensas o humillaciones, sino que supone también la afirmación del pleno desarrollo de la personalidad de cada individuo. El pleno desarrollo de la personalidad implica, a su vez, de un lado, el reconocimiento de la total *autodisponibilidad,* sin interferencias o impedimentos externos, de las posibilidades de actuación propias de cada hombre; de otro,

la *autodeterminación* que surge de la libre proyección histórica de la razón humana, antes que de una predeterminación dada por la naturaleza de una vez por todas." (Bastardillas en original.) Galán Juárez, *Intimidad, Nuevas dimensiones de un viejo derecho*, Editorial universitaria Ramón Areces, Madrid, 2004, págs. 116-117. Es, a fin de cuentas, como nos recuerda el profesor Peces-Barba, "un proyecto que debe realizarse y conquistarse." Peces-Barba Martínez, *op. cit.*, pág. 68.

La dignidad humana es por lo tanto una empresa continua de autorrealización que se manifiesta en la autodeterminación consciente y responsable de la propia vida y que lleva consigo la pretensión al respeto por parte de los demás. En similar tenor se expresa el profesor Hiram Meléndez Juarbe al señalar:

> [T]he most diverse authorities on the subject have recognized that human dignity is generally associated with the notion *of respect for the intrinsic worth of every person* or, in a word, '*personhood*'. Those who have tried to give precise content to this principle have identified, as an important corollary, the protection *of autonomous choice in the development of personal identity.* For one commentator human dignity entails that 'a high priority should be accorded in political, social and legal arrangements to *individual choices* in such matters as belief, way of life, attitudes and the conduct of public affairs.'" (Bastardillas en original.) (Citas omitidas.)

H. Meléndez Juarbe, Privacy in Puerto Rico and the Madman´s Plight: Decisions, 9 *Geo. J. Gender & L.* 1, 45 (2008).

De otra parte, los contornos del derecho a la intimidad son también de difícil concreción. Se trata de un derecho complejo, que acusa múltiples manifestaciones.

Lo que sí hemos expresado, consistentemente, es que ocupa un lugar de primacía frente a otros derechos y que "responde a un concepto del individuo hondamente arraigado en nuestra cultura." *ELA v. Hermandad de Empleados*, 104 D.P.R. 436, 439 (1975). A la misma vez, es reflejo de la formulación de una "Carta de Derechos de factura más ancha que la tradicional, que recog[e] el sentir común de culturas diversas sobre nuevas categorías de derechos." *Íbid*, pág. 440. Hemos considerado que este derecho "constituye un ámbito exento capaz de impedir y limitar la intervención de terceros —sean particulares o poderes públicos— contra la voluntad del titular." *López Tristani v. Maldonado* Carrero, 168 D.P.R. 838 (2006).

Soy del criterio que el derecho a la intimidad es un derecho dilatado, que "cuando más se focaliza el objeto del derecho para dar razón de él, más amplio y genérico se nos muestra. [Y a]l intentar acotarlo y precisarlo, se nos escapa." N. González Gaitano, *El Deber de Respeto a la Intimidad*, Ediciones Universidad de Navarra, S.A., Pamplona, 1990, pág. 149. Todo lo cual aconseja a "no definir lo indefinible." *Íbid*, pág. 151. A pesar de lo dicho, considero adecuada la aproximación al tema del profesor Rebollo Delgado, por lo que le cito extensamente:

> El derecho a la intimidad en su configuración nuclear es un derecho subjetivo, de defensa de una parcela de nuestra vida que queremos mantener reservada, y de la que tenemos plena disposición. Es también una garantía de pluralismo y de democracia, en la medida que es en lo privado donde radica la diversidad, la singularidad, que se proyecta en un sistema democrático en el pluralismo. Es un derecho positivo, es decir,

está inserto en nuestra Constitución y configurado como un derecho de rango superior en base a sus garantías y a su esencialidad. Se instituye el derecho a la intimidad también como una expresión de libertad, como una manifestación de la misma. Por último, el derecho a la intimidad es la concreción de uno de los fundamentos que el constituyente establece para la correcta convivencia social, como es en esencia la dignidad humana, la garantía de los derechos inviolables que son inherentes a la persona, y el libre desarrollo de su personalidad. Se deduce pues, la importancia del derecho a la intimidad, tanto por el ámbito que protege, como por el fin al que obedece su protección. Pero aún es más significativo el hecho de que es un derecho que viene de forma directa a posibilitar una existencia pacífica del ser humano, tanto consigo mismo, como con los demás seres con que convive, siendo este un objetivo nuclear de toda sociedad.

L. Rebollo Delgado, *El Derecho Fundamental a la Intimidad*, Dykinson, S.L., 2da ed., Madrid, 2005, pág. 125. Así entendido, el derecho a la intimidad necesariamente protege la prerrogativa de toda persona a tomar ciertas decisiones importantes e íntimas sobre cómo conducir la vida misma como manifestación de su autorrealización. Véanse, *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987) (Naveira Merly, op. concurrente); *Sostre Lacot. v. Echelin of PR, Inc.*, 126 D.P.R 781 (1990) (Negrón García, J. voto disidente); *Salvá Santiago v. Torres Padró*, res. 1 de junio de 2007, 171 D.P.R. ___, 2007 TSPR 101 (Rodríguez Rodríguez, J., op. disidente). Véase además, L. J. Mieres Mieres, *Intimidad Personal y Familiar*, Editorial Aranzadi, S.A., Navarra, 2002, págs. 29-33. Solamente en la intimidad es posible que una persona actúe libremente sin que el ojo ajeno atice y esclavice.

Conforme a lo expresado, sostengo que el derecho a rechazar tratamiento médico es una manifestación más de la voluntad individualizada de la persona respecto a la elección y desarrollo de su plan de vida. Es cada cual quien es "el guardián natural de su propia salud, sea física, mental o espiritual." Galán Juárez, *op. cit.,* pág. 130. Esta es una decisión autónoma tomada desde lo más íntimo, a través de la cual, "regimos nuestro destino (individualmente y en relación con otros), decidimos quiénes somos y queremos ser y, por ende, la forma en que nos proponemos vivir." (Bastardillas en original.) H. Meléndez Juarbe, La Constitución en ceros y unos: un acercamiento digital al derecho a la intimidad y la seguridad jurídica, 77 *Rev. Jur. U.P.R.* 45, 49 (2007).

El rechazo a la distanasia no es otra cosa sino valorar la dignidad humana. El derecho a rehusar tratamiento médico es por lo tanto de dimensión constitucional y se asienta, necesariamente, sobre el derecho a la intimidad y el derecho a la dignidad del ser humano. Además de ser corolario del principio del consentimiento informado, como resuelve la mayoría.

V

A

La Exposición de Motivos de la Ley núm. 160, así como su historial legislativo, ponen de manifiesto que el legislador fue consciente de las implicaciones que la ley propuesta tenía sobre el derecho a la intimidad del individuo así como sobre su dignidad. A esos efectos, la

Exposición de Motivos señala que la ley "atiende al reclamo del derecho a la intimidad y al reconocimiento de la autonomía de la voluntad del individuo para integrar a nuestro ordenamiento jurídico un proceso legal mediante el cual el individuo mayor de edad, en pleno uso de sus facultades mentales" pueda rechazar tratamiento médico anticipadamente. El Informe de la Comisión de lo Jurídico del Senado de Puerto Rico, sobre el P. de la C. 386, pág. 15, por su parte, abundó sobre el particular y reconoció que a todo paciente en Puerto Rico le asiste el derecho "a la autodeterminación, como parte de su derecho constitucional a la intimidad, es decir, a decidir libremente qué hacer con su cuerpo…."

Ello no obstante, el legislador sólo proveyó para que las directrices anticipadas estuvieran disponibles para aquellos casos en que el paciente hubiese sido diagnosticado con una condición terminal o estuviese en estado vegetativo persistente, lo que a su vez limita el ejercicio de la discreción del mandatario, impidiéndole que haga efectiva la voluntad declarada.

Recordemos que en este caso, el señor Hernández Laboy, en su testamento vital indicó que rechazaba: "absoluta, inequívoca y resueltamente sangre alogénica (sangre de otra persona) y sangre autóloga almacenada (mi propia sangre almacenada) **en toda circunstancia, sin importar cuál sea mi estado de salud.** Esto significa que no se me administre sangre total ni ninguno de sus componentes principales […], sean cuales sean las consecuencias. No acepto sangre aún

cuando el personal médico […] crea que sólo la transfusión sanguínea preservará mi vida o mi salud." (Énfasis nuestro.) Sostengo entonces que circunscribir el ejercicio de la voluntad del señor Hernández Laboy y por lo tanto las facultades del mandatario a las dos situaciones que dispone la Ley Núm. 160, impone un peso por demás oneroso sobre su derecho constitucional a la intimidad y a la dignidad del ser humano que no se justifica. Lo que supone un grave problema de inconstitucionalidad de la ley, cuando menos, por subinclusión.

Si reconocemos que el derecho a rechazar tratamiento médico es un interés constitucionalmente protegido, como expresión del derecho a la intimidad en su modalidad de la autonomía individual y como reconocimiento de la inviolabilidad de la dignidad humana, cuando se le regula para circunscribirlo a las dos instancias antes mencionadas se requiere que el Estado articule una razón preeminente o de superior jerarquía que así lo justifique, lo que ciertamente no ha ocurrido en este caso. No podemos discernir, ni del texto de la ley, ni de su historial legislativo, cuál pueda ser ese interés preeminente que justifique la diferenciación que establece la ley para negar un derecho constitucional. Queda claro entonces que las limitaciones impuestas por la Ley Núm. 160 al ejercicio de la libre voluntad del declarante vician dicha ley de inconstitucionalidad, por lo que es acertada la determinación que hoy toma este Tribunal.

VI

Unas consideraciones finales. Coinciden en esta controversia planteamientos de carácter religioso ya que la objeción del señor Hernández Laboy a ser transfundido se fundamenta en los postulados de su religión. Véase, R. Rotunda, J. Nowak, *Treatise on Constitutional Law, Substance and Procedure*, Thomson/West, 4ta ed., 2008, vol. 6, sec. 21.9(b)(iii), pág. 224. ("When the objection to medical treatment is based on religious principles, a serious free exercise clause problem is presented.")[27] Muy en particular, cuando el reclamo de libertad de culto está acompañado de una alegación de que se ha violado también otra disposición constitucional como lo es el derecho a la intimidad y a la dignidad del ser humano, lo que exigiría que se analizara el estatuto bajo el criterio de análisis más riguroso y que se determinara también si la ley, según redactada, se ajusta rigurosamente al interés apremiante que se pretende adelantar. *Employment Division v. Smith*, 494 U.S. 872, 881-882 (1990). Véase además, Chemerinsky, *op. cit.*, sec. 12.3.2.3, págs. 1258-1260.

Ahora bien, en virtud del resultado que llegamos bajo el derecho a la intimidad y a la inviolabilidad de la

---

[27] Sobre este asunto véanse, a modo de ejemplo los siguientes casos, entre otros: *Wons v. The Public Health Trust of Dade County*, 500 So.2d 679 (Fla. 1987); *In re Milton*, 505 N.E.2d 255 (Ohio 1987); *St Mary´s Hospital v. Ramsey*, 465 So.2d 666 (Fla. 1985); *Mercy Hospital, Inc. Jackson*, 489 A.2d 1130 (Ct. 1985); *In re Brown*, 478 So.2d 1033 (Miss. 1985); *In re Brooks Estate*, 205 N.E.2d 435 (Ill. 1965); *Homes v. Silver Cross Hospital of Joliet, Illinois*, 340 F. Supp. 125 (N.D. Ill. 1972); *In the Matter of Osborne*, 294 A.2d 372 (D.C. App. 1972).

dignidad humana, estimamos innecesario expresarnos en mayor extensión sobre este aspecto que subyace la controversia ante nuestra consideración. [28]

Para concluir, entiendo que el señor Hernández Laboy tenía un derecho constitucional a rechazar la transfusión a que fue sometido como secuela y exigencia de su derecho a la intimidad y a la dignidad del ser humano y como manifestación también del interés libertario reconocido bajo la cláusula de debido proceso de ley. Es por ello que estoy conforme con el dictamen mayoritario de que el artículo 6 de la Ley núm. 160 atenta contra los derechos constitucionales de todo declarante por lo que es patentemente inconstitucional.

Anabelle Rodríguez Rodríguez<br>
Juez Asociada

---

[28] Aun cuando nosotros no nos habíamos enfrentado a esta controversia en el pasado, no así el Tribunal de Apelaciones. Véase, Watch Tower and Bible Tract Society of Pennsylvania, Inc. v. ELA, KLAN-95-000721.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luz E. Lozada Tirado, Andrea
Hernández Lozada, Elizabeth
Hernández  Lozada  y  Luis
Damián Hernández Lozada

     Recurridos

       v.

Roberto  Tirado  Flecha  y  la
Congregación  Cristiana  de
los  Testigos  de  Jehová  de
Puerto Rico, Inc.

     Peticionarios

*Certiorari*

CC-2006-94

Opinión  disidente  emitida  por  la  Jueza  Asociada  Señora
Pabón  Charneco  a  la  que  se  le  une  el  Juez  Asociado  señor
Martínez Torres

En San Juan, Puerto Rico, a 27 de enero de 2010.

Todo paciente tiene derecho a consentir y a rechazar tratamiento médico. No obstante, este derecho no es absoluto. Mediante la Ley Núm. 160 de 17 de noviembre de 2001, conocida como "Ley de Declaración Previa de Voluntad sobre Tratamiento Médico en Caso de Sufrir una Condición de Salud Terminal o de Estado Vegetativo Persistente", 24 L.P.R.A. sec. 3651 *et seq.*, la Asamblea Legislativa estableció los parámetros necesarios para hacer viable ese derecho luego de un minucioso escrutinio de las diversas implicaciones que su ejercicio

conlleva. Por tanto, disiento respetuosamente de la Opinión mayoritaria respecto a la declaración de inconstitucionalidad del Artículo 6 de la Ley Núm. 160, *supra.*

Además, la determinación de la existencia de un derecho a rechazar tratamiento médico sin sujeción a condición o limite alguno que el que "su ejercicio cause grave daño a la vida de terceras personas", descarta, como consecuencia, todos los intereses del Estado que han sido, a su vez, reconocidos por los distintos tribunales estatales y federales.

## I.

El 5 de abril de 2004, el señor Víctor Hernández Laboy (en adelante, el declarante o mandante), quien era feligrés de una Congregación de los Testigos de Jehová, administrada por la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc., otorgó un documento intitulado *Designación de Mandatario para la Atención Médica* (en adelante, la Declaración de Voluntad). Éste fue otorgado de conformidad con la Ley Núm. 160, *supra.*

La Declaración de Voluntad referida incluía el rechazo absoluto a la administración de sangre, expresaba el deseo del declarante a que no se prolongara su vida de no haber esperanza de vida o de estar desahuciado, y designaba al señor Roberto Tirado Flecha como mandatario primario para atención médica "[e]n virtud de la Ley 160

del 17 de noviembre de 2001 y ante la eventualidad de ser víctima de una enfermedad terminal o de estado vegetativo persistente".

El 17 de junio de 2005, el declarante sufrió un accidente automovilístico que le causó lesiones graves por lo que fue recluido en la Unidad de Trauma Intensivo del Centro Médico de San Juan. Su esposa, la señora Luz E. Lozada Tirado, solicitó al Tribunal Municipal de Humacao que emitiera una orden autorizando la transfusión de sangre para el declarante. El 22 de junio de 2005, dicho foro emitió una Orden *ex parte* dirigida a la Unidad de Trauma Intensivo en la que dispuso transfundir al paciente y ordenó cualquier otro procedimiento médico que su condición requiriera para la preservación de la vida.

Por su parte, el señor Roberto Tirado Flecha presentó al hospital la Declaración de Voluntad del declarante que lo designaba como su mandatario y se opuso a la transfusión de sangre. Como consecuencia, el Centro Médico se negó a acatar la Orden emitida por el Tribunal Municipal de Humacao, por lo que el 23 de junio de 2005 la señora Lozada Tirado y sus hijos (en adelante, los recurridos) acudieron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, y solicitaron que se ordenara la transfusión de sangre, así como cualquier otro procedimiento médico que requiriera la condición del declarante. Ese mismo día, luego de escuchar el

testimonio de los recurridos donde éstos expresaron que el declarante se encontraba inconsciente y en peligro de muerte, el tribunal emitió una Resolución en la que concedió el petitorio y ordenó al Centro Médico a transfundir sangre o dializar al declarante de requerirlo su condición de salud.

Así las cosas, al día siguiente se celebró una segunda vista para considerar los planteamientos del señor Roberto Tirado Flecha, quien alegó ser mandatario del declarante. A tales efectos, presentó la Declaración de Voluntad suscrita por el declarante en la que lo designaba como su mandatario a tenor con la Ley Núm. 160, *supra*. A su vez, argumentó ante dicho foro que la Resolución emitida el 23 de junio de 2005 constituía una violación de los derechos de libertad de culto y privacidad del declarante. Por su parte, los recurridos alegaron la existencia de circunstancias apremiantes que justificaban la intervención del tribunal con la decisión del declarante de no aceptar sangre: el bienestar de un hijo menor de edad.[29] El citado tribunal resolvió mantener en vigor la Resolución emitida el 23 de junio de 2005 por entender que existía un interés apremiante del Estado para

---

[29] Surge de los autos que la señora Lozada Tirado "testificó que procreó seis hijos con [el señor] Hernández Laboy [pero] éstos no residen cerca. Aclaró que el menor […] es hijo biológico de su hijo Fabián Hernández Lozada quien falleció. Ella y su esposo [lo] adoptaron legalmente".

obligar al declarante a recibir sangre y a ser dializado.[30] El hospital, entonces, procedió con la transfusión. A los pocos días, el declarante falleció.

Inconformes, el señor Roberto Tirado Flecha y la congregación religiosa a la que el declarante pertenecía en vida, recurrieron la citada Resolución ante el Tribunal de Apelaciones. Dicho foro concluyó que estos carecían de legitimación activa para presentar el recurso de *certiorari*. El tribunal *a quo* resolvió que el señor Roberto Tirado Flecha no estaba legitimado para actuar como mandatario ante los tribunales por no probar la condición médica del declarante. La prueba mencionada era requerida para que la Declaración de Voluntad y, a su vez, el mandato advinieran ejecutables. Por otra parte, dictaminó que la Congregación Cristiana de los Testigos de Jehová de Puerto Rico, Inc. tampoco contaba con legitimación activa para cuestionar dicha Resolución por no haber sido parte en los procedimientos ante el tribunal de instancia. Insatisfechos, el señor Roberto Tirado Flecha y la congregación religiosa a la que el declarante pertenecía en vida acuden ante este Foro.

---

[30] Concluyó el tribunal de instancia que la peticionaria "es una mujer de escasos recursos económicos y de una capacidad intelectual baja. El cuadro que nos presenta la testigo, nos hace concluir que ella sola no puede hacerse cargo del menor […]. Además, el menor podría afectarse emocionalmente con la pérdida de su padre adoptivo habiendo perdido hace poco tiempo a su padre biológico".

## II

En Puerto Rico se ha reconocido que "el derecho de todo paciente a la autodeterminación, es decir, a decidir libremente que debe hacerse con su cuerpo [con relación a tratamientos médicos] está protegido por los tribunales. Como regla general implica la previa prestación del consentimiento informado del paciente para toda intervención quirúrgica". *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735, 742 (1994).[31] De este derecho se desprende, a su vez, como cuestión lógica, el derecho del paciente a rechazar tratamiento médico. Véase, *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 270 (1990); Véanse, además, S. Becker, *Health Care Law: A Practical Guide*, 2da ed., New York, Matthew Bender Lexis, 2008, sec 19. págs. 19-27 a 19-28; F.A. Rozovsky, *Consent to Treatment: A Practical Guide,* New York, Aspen Publishers, 2007, sec. 7.01, pág. 7-3; R.S. Olick, *Taking Advance Directives Seriously: Prospective Autonomy and Decisions near the End of Life*, Washington, D.C.,

---

[31] Nuestra jurisprudencia ha reconocido el derecho de un paciente a consentir a tratamiento médico conforme a la doctrina de consentimiento informado originada en el derecho común anglosajón. Véanse, *Santiago Otero v. Méndez*, 135 D.P.R. 540, 557 n.24 (1994) (Este caso refiere a jurisprudencia que reconoce la doctrina de consentimiento informado en nuestro ordenamiento); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968); *Montes v. Fondo del Seguro del Estado*, 87 D.P.R. 199 (1963); *Rojas v. Maldonado*, 68 D.P.R. 818 (1948). Véase, además, *Union P. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.")

Georgetown University Press, 2001, pág. 9. No obstante,

**este derecho no es absoluto**. Véanse, *Torres Pérez v. Hosp.*

*Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968); *Montes v. Fondo*

*del Seguro del Estado*, 87 D.P.R. 199 (1963); *Rojas v.*

*Maldonado*, 68 D.P.R. 818 (1948).

La Asamblea Legislativa, en reconocimiento al derecho

a la intimidad, la autonomía individual y la dignidad

humana,[32] ha dispuesto, mediante la Ley Núm. 160, *supra,*

entre otros extremos, (1) de una forma determinada para

evidenciar la voluntad sobre aceptación o rechazo de

tratamiento médico para aquellos momentos especificados en

la ley en los que el declarante se encuentre incapacitado

para expresarla;[33] (2) la figura de un mandatario capaz de

tomar decisiones en momentos de incapacidad;[34] (3) el

mandato a los médicos e instituciones de servicios a

cumplir con su voluntad; (4) la concesión expresa de inmunidad civil

o criminal a los médicos, instituciones de servicio de salud y otras

personas        señaladas     en la ley por hacer valer las

---

[32] Exposición de Motivos de la Ley Núm. 160, *supra,* 2001 Leyes de Puerto Rico, 809.

[33] La Declaración previa de voluntad de tratamiento médico, conocida en ingles como *living will,* es un tipo de directriz adelantada.  Este es un documento suscrito por una persona competente por el cual se comunica a los demás que intervenciones médicas no se desean en caso de sufrir una enfermedad terminal o estar en estado vegetativo persistente. T. McConnell, *Inalienable Rights: The Limits of Consent in Medicine and the Law*, Ed. Oxford University Press, 2000, pág. 112.

[34] Otro tipo de directrices adelantadas es el poder para la atención médica. *Íd*.  ("A *health care power of attorney* is a document in which one designates another specific individual to make one's medical decisions if and when one no longer has the capacity to do so oneself. The sort of health care decisions that a health care agent may make for the person for whom she is a proxy varies form state to state.")

disposiciones de la ley y, por consiguiente, la voluntad del paciente, y (5) la designación de un *subrogado designado* conforme al orden sucesoral en caso de que el declarante no haya dispuesto sobre ello. Tales disposiciones promueven el derecho a la autodeterminación del paciente que estando consciente expresó su voluntad sobre tratamiento médico.

La primera y segunda de las premisas antes citadas fueron previamente reconocidas y condicionadas en la Ley Núm. 194 de 25 de agosto de 2000, según enmendada, conocida como "Carta de Derechos y Responsabilidades del Paciente", 24 L.P.R.A. sec. 3047.[35] Dicho estatuto expresa en el inciso (b) de su Artículo 9 que:

---

[35] De especial relevancia nos es la Exposición de Motivos de la Ley Núm. 194, *supra,* la cual esboza la intención de la Asamblea Legislativa al aprobar el estatuto:

Uno de los principales objetivos del Gobierno de Puerto Rico en años recientes ha sido lograr que todos los ciudadanos tengan acceso adecuado a servicios y facilidades de salud médico-hospitalarias de calidad, de acuerdo con sus necesidades e irrespectivamente de su condición socioeconómica y capacidad de pago. Esta importante meta social, que en gran medida representa el cumplimiento de un compromiso latente en la Constitución de Puerto Rico, surge del convencimiento, demostrado por la experiencia acumulada de varias décadas, de que el acceso adecuado a servicios de salud de calidad es un componente esencial en cualquier definición válida del concepto de calidad de vida, así como un derecho humano fundamental.

Para cumplir con ese compromiso vital con el pueblo de Puerto Rico se han aprobado en años recientes numerosas leyes y se han implantado numerosas medidas administrativas y actuaciones ejecutivas encaminadas a hacer realidad el sueño de proveer a cada familia puertorriqueña de un acceso adecuado a servicios médicos de calidad, sin consideración alguna a su condición socioeconómica. Esta importante meta es ya realidad en gran medida, gracias a la aprobación de la Ley Núm. 72 de 7 de septiembre de 1993, conocida como "Ley de la Administración de Seguros de Salud de Puerto Rico". Sin embargo, para proteger la salud de nuestro pueblo no es suficiente asegurar la disponibilidad y acceso a servicios de calidad, también es necesario que los usuarios de servicios de salud conozcan sus

Todo médico o profesional de la salud deberá proveer a sus pacientes información suficiente y adecuada, así como la oportunidad real, de participar en forma significativa en las decisiones relacionadas con su cuidado médico y

---

derechos y responsabilidades y tengan disponible toda la información necesaria para tomar sus propias decisiones.

Los cambios recientes en la industria de servicios de salud médico-hospitalarios también abonan a la búsqueda de medios para asegurar que los usuarios y consumidores de tales servicios tengan toda la información pertinente a su disposición a la hora de seleccionar los servicios de salud médico-hospitalarios que utilizarán. El énfasis cada día mayor en el control y reducción de costos en el cuidado de la salud, la limitación de beneficios y alternativas de tratamiento en numerosos programas y planes, el enfoque preventivo en el cuidado de la salud y la proliferación de planes y programas de cuidado dirigido (*managed care*) y de organizaciones de cuidado preventivo de la salud (*health maintenance organizations* o *HMO's* por sus siglas en inglés) hacen aún más importante el garantizar el libre flujo de información completa, fidedigna y veraz a los usuarios y consumidores de los servicios de salud. Es importante que los usuarios y consumidores de tales servicios estén conscientes no sólo de sus derechos sino también de sus responsabilidades, tanto económicas como de cualquier otra clase, bajo las distintas alternativas de servicios de salud y tratamiento que tienen a su disposición. En última instancia, se trata de dos caras de la misma moneda, es decir, de procurar que la población que utiliza tales servicios lo haga con plena conciencia de sus derechos y deberes, de sus prerrogativas y responsabilidades, bajo las alternativas disponibles.

La promulgación de esta Ley contribuirá visiblemente a la formación de un público mejor informado, más consciente, más responsable y seguramente más saludable, lo cual tendrá el efecto de promover una utilización más eficiente de los recursos disponibles en esta importante área y redundará a largo plazo en considerable provecho para el pueblo de Puerto Rico. Se trata, a fin de cuentas, de un componente adicional en la reforma de salud y de una herramienta más en la búsqueda constante de alternativas y soluciones a los problemas de salud de nuestro pueblo, sobre todo del sector menos aventajado económicamente.

Por último, la inclusión de penalidades a proveedores y aseguradores de servicios de salud médico-hospitalarios por incumplir con ciertos requisitos de esta Ley, incluyendo no divulgar la totalidad de la información requerida por esta Ley o divulgar intencionalmente o a sabiendas información falsa, asegura que los consumidores tendrán la información que necesitan y requieren para tomar las decisiones que atañen uno de los aspectos más importantes en la vida de todo ser humano: las decisiones relativas a la salud propia y de los seres queridos. Exposición de Motivos de la Ley Núm. 194, *supra,* 2000 Leyes de Puerto Rico, 1274.

de salud, de manera que dicho paciente pueda prestar su consentimiento a dichas decisiones, incluyendo, pero sin limitarse a, la discusión de opciones de tratamiento de una manera que dicho paciente entienda las mismas, y la opción de rehusar o no recibir ningún tratamiento, así como todos los costos, riesgos y probabilidades de éxito de dichas opciones de tratamiento o no tratamiento y cualquier preferencia futura del paciente en caso de que en determinado momento éste pueda perder la capacidad de expresar válidamente su consentimiento a distintas opciones de tratamiento.

Por su parte, el inciso (c) del Artículo 9 de la Ley Núm. 194, *supra*, dispone del derecho al

…uso de directrices o guías adelantadas en relación a su tratamiento, o designar a una persona que actué como su tutor en caso de ser necesario para la toma de decisiones. Todo médico o profesional de la salud deberá discutir con sus pacientes y los familiares de éstos el uso de directrices o guías adelantadas de preferencia, incluyendo, pero sin limitarse a, el uso de poderes y testamentos vivientes (*living wills*). **El proveedor honrará dicho deseo hasta donde éste sea permitido por ley**. (Énfasis suplido) 24 L.P.R.A. sec. 3047(b y c).

Es nuestra contención que en respuesta a esta disposición de la Ley Núm. 194, *supra*, la Asamblea Legislativa promulgó la Ley Núm. 160, *supra,* estableciendo los parámetros necesarios para hacer viable ese derecho.

Por tanto, la Ley Núm. 160, *supra*, es, además, un esfuerzo de la Asamblea Legislativa para viabilizar los derechos de pacientes, reconocidos de forma general y condicionados mediante la Ley Núm. 194, *supra*. La citada Ley Núm. 160 crea mecanismos para proteger la voluntad del declarante. Al igual que en algunos Estados de la Unión,

donde se han ido desarrollando paulatinamente sus respectivos ordenamientos jurídicos para posibilitar estos derechos, le corresponde a la Asamblea Legislativa actuar al respecto a fin de considerar la complejidad de las controversias relacionadas particularmente con el derecho al rechazo de tratamiento médico y los intereses estatales que representa. Esto por las implicaciones médicas, jurídicas, bioéticas, políticas, religiosas, culturales y familiares que conllevan. Por estas mismas razones, las controversias que sean presentadas ante los tribunales deben ser analizadas caso a caso.

La Opinión que emite hoy este Tribunal expresa que el Artículo 6 de la Ley Núm. 160, *supra*, anula la voluntad del declarante al infringir sus derechos constitucionales tanto bajo la Constitución de Puerto Rico como la Constitución de Estados Unidos. Particularmente, señala que el ordenamiento constitucional protege el derecho de las personas a rechazar tratamiento médico expresado de forma anticipada sin estar sujeto a las condiciones dispuestas en el Artículo 6 de la Ley Núm. 160, *supra*, o ninguna otra. Expresa, a la luz de lo resuelto en *Cruzan v. Director, supra,* que la voluntad del paciente mayor de edad debe respetarse cuando es informada; éste es consciente de las posibles consecuencias de su decisión; existe evidencia clara y convincente de voluntad, y está

sujeta a un balance entre la voluntad del paciente y los intereses apremiantes del Estado.

El Tribunal Supremo de los Estados Unidos en *Cruzan v. Director, supra,* caso en el que los padres solicitaron a nombre de su hija en estado vegetativo que se ordenara la remoción del equipo de nutrición e hidratación, presumió, con relación a los hechos de dicho caso en particular, la existencia del derecho de un paciente competente a rehusar la nutrición e hidratación como interés libertario protegido por la Cláusula del Debido Proceso de Ley de la Constitución de Estados Unidos.[36]   Emda. XIV, Const. EE. UU., L.P.R.A., Tomo I, ed. 2008, pág. 206. Asimismo, señaló que bajo el derecho común anglosajón una

---

[36] La Opinión apunta que el derecho a rechazar tratamiento médico está protegido por las Constituciones de Estados Unidos y de Puerto Rico. No obstante, "There was a 5 to 4 division of the Justices in [*Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 270 (1990)] and the ruling in the case was a narrow one. The concurring opinion of Justice O'Connor in *Cruzan*, and *dicta* in the majority opinion, resulted in the states being left with little guidance regarding whether they were required to recognize any type of right to refuse life sustaining medical treatment". 4 Rotunda and Nowak, *Treatise on Constitutional Law*: *Substance and Procedure*, Sec. 18.30(c) (2007), pág. 208. Véase, además, *Conservatorship of Wendland*, 28 P.3d 151, 159 (Cal., 2001) ("Federal law has little to say about the competent person´s right to refuse treatment, but what it does say is not to the contrary.")

Aunque el Tribunal Supremo de Estados Unidos hizo mención del caso *In re Quinlan,* 355 A.2d 647 (N.J. 1976), que determinara que la paciente tenía un derecho a la intimidad basado en la Constitución de Estados Unidos para rechazar tratamiento, el más alto foro federal no lo reconoció.  Además, cabe señalar que "[l]a controversia que le fue planteada al Tribunal Supremo Federal giró en torno a si un requisito evidenciario del Estado de Missouri era inconstitucional.   En realidad, la controversia presentada [en *Cruzan v. Director, supra,*] no fue el reconocimiento de un derecho constitucional a morir manifestado a través del rechazo de tratamiento médico vital". T. Medina Monteserrín, *El Derecho a una muerte natural: manifestación última de la libertad personal y de la autonomía individual,* 60(1) *Rev. Jur. U.P.R.* 295, 299 n. 18 (1991).

persona tiene el derecho a determinar que hacer con su cuerpo y que como corolario lógico el paciente tiene el derecho a rechazar tratamiento. Sin embargo, para decidir si sus derechos constitucionales han sido violados, expresa que se debe realizar un balance de intereses libertarios con aquellos intereses relevantes del Estado.

Diversas jurisdicciones han reconocido cuatro intereses estatales que pueden limitar el derecho del paciente a rechazar tratamiento médico: (1) la preservación de la vida humana;[37] (2) la prevención del suicidio; (3) la protección de la integridad ética de la clase médica, y (4) la protección de terceros inocentes. *Cruzan v. Director, supra*. La Opinión que emite este Tribunal concluye que el derecho al rechazo de tratamiento médico está sujeto "sólo al requisito de evidencia clara y convincente de que esa hubiese sido la decisión del paciente y al balance de aquellos intereses apremiantes que pudiera invocar el Estado". No obstante, prácticamente descarta todos los intereses del Estado que han sido reconocidos por otros tribunales estatales y por el

---

[37] El Tribunal Supremo Federal ha dado particular apoyo a un "unqualified interest in the preservation of human life" del Estado. *Cruzan v. Director, supra,* pág. 282; Véase, en el contexto del suicidio asistido, *Washington v. Glucksberg*, 521 U.S. 702 (1997). Además, se ha reconocido que el interés del estado en autorizar tratamiento médico disminuye mientras el derecho a la autodeterminación aumenta según el grado de invasión corporal aumenta y el pronóstico médico disminuye. *Rasmussen v. Fleming*, 741 P.2d 674, 683 (Ariz. 1987)(«Although the state's interest in preserving life is justifiably strong, we believe this interest necessarily weakens and must yield to the patient's interest where treatment at issue "serves only to prolong a life inflicted with an incurable condition."»). Véase, además, *In re Quinlan, supra,* pág. 664. No obstante, no contamos con este tipo de información en el caso de autos.

Tribunal Supremo de Estados Unidos, admitiendo como único limite a dicho derecho el que el rechazo "cause grave daño a la vida de terceras personas".[38] **Tal proceder es aun más**

---

[38] Además, la Opinión mayoritaria estudia el posible abandono del menor. No obstante, utiliza como análisis el "total abandono de un hijo menor de edad". Entendemos que el término "total" es demasiado amplio, ambiguo y no se sostiene de una lectura de los casos citados. Asimismo, los casos empleados para adoptar dicho análisis son distinguibles de los hechos del caso de auto. En *The Stamford Hospital v. Vega,* 674 A. 2d 821 (Conn. 1996) el Tribunal Supremo de Connecticut analizó el derecho a rechazar tratamiento médico de la paciente, madre de un recién nacido, y los intereses del hospital. Esto debido a que determinó que el hospital no debía representar los intereses del Estado, pero sí podía recurrir al foro judicial con relación a sus propios intereses. Fue a la luz del interés del hospital y no del Estado – en caso de un posible abandono de uno de sus pacientes – que el Tribunal analizó la controversia.

Asimismo, en *In re Matter of Patricia Dubreuil*, 629 So. 2d 819 (Fla. 1993) el Tribunal Supremo de Florida determinó que es el Estado el que tiene el peso de defender los intereses estatales y, por tanto, éste debe ser informado de los procedimientos alejándose así de *Public Health Trust of Dade County v. Wons,* 541 So.2d 96 (Fla. 1989). No obstante, el Tribunal entra en los méritos del caso debido a que el hospital asumió por el Estado el peso de la prueba respecto al interés en proteger a terceros inocentes. Además, Patricia Dubreuil, feligrés de una Congregación de los Testigos de Jehová y, además, madre de cuatro menores, sobrevivió luego de las transfusiones de sangre a las que fue sometida. Entonces, Dubreuil solicitó reconsideración y durante tal etapa sometió un testimonio por el que hizo constar que miembros de su familia y amigos estaban dispuestos a ayudar en la crianza de los menores en caso de su muerte. El Tribunal Supremo valoró dicho testimonio en conjunción con que no surgía del expediente prueba de un posible abandono en caso de morir Dubreuil por falta de tratamiento médico y de la presunción de que el padre sobreviviente tendría entera responsabilidad legal sobre el cuidado de los menores.

Por otro lado, en *Fosmire v. Nicoleau*, 551 N.E.2d 77 (N.Y. 1990), el más alto foro del estado de Nueva York dispuso que la paciente, adulta y competente, tiene derecho a rechazar tratamiento médico sin importar el que sea madre debido a que no se demostró un interés superior del Estado y que tal derecho está reconocido por el derecho común anglosajón y avalado por el derecho estatutario y principios constitucionales. El Tribunal señaló que en dicho caso no decidía respecto a un paciente que mientras competente expresó su rechazo a tratamiento en circunstancias específicas y que posteriormente advino incompetente.

En *Norwood Hospital v. Muñoz,* 564 N.E.2d 1017 (Mass. 1991), el Tribunal Supremo de Massachusetts también analizó el interés estatal de proteger a terceras personas. Concluyó que no se presentó evidencia convincente del abandono del menor en caso de la muerte de su madre. Por el contrario, el padre del menor apoyaba la voluntad de

su esposa; contaba con los recursos económicos para cuidar al menor y con familiares que lo apoyarían en su crianza.

**amplio que las decisiones que toma como referencia y reconoce un derecho absoluto al rechazo de tratamiento médico.** Este derecho no es absoluto, aún cuando esté fundamentado en el derecho común anglosajón o en el ordenamiento constitucional.[39]

El alcance de las determinaciones esbozadas por el Tribunal deben ser analizadas con sumo cuidado. El Tribunal Supremo Federal, así como aquellos tribunales estatales en cuyas decisiones se basan tales conclusiones se han limitado a adjudicar los hechos particulares de cada caso.[40] Además, las determinaciones realizadas en varias jurisdicciones se han desarrollado a la luz de los cambios legislativos.[41]

---

[39] "El derecho a la intimidad no necesita de legislación habilitadora que le insufle vida ya que opera por su propia fuerza, *ex proprio vigore*". *Rexach v. Ramírez*, 162 D.P.R. 130, 144 (2004). «No obstante, [éste] no es un derecho absoluto, ni "vence a todo valor en conflicto bajo todo supuesto posible."» *Castro v. Tiendas Pitusa*, 159 D.P.R. 650, 659 (2003). Por otra parte, respecto a la libertad de culto hemos expresado anteriormente que "la libertad de actuar, al amparo de una práctica religiosa, está forzosamente limitada o restringida para proteger la paz, la moral y el orden público ya que de otra manera se instituiría un cantón aparte donde le estaría vedado al gobierno hacer respetar las leyes de protección social." *Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610, 636 (1997).

[40] *Cruzan v. Director, supra,* págs. 277-78, *citando a Twin City Bank v. Nebeker,* 167 U.S. 196, 202 (1897)("a question of such magnitude and importance … it is the [better] part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject.")(Corchetes en el original).

[41] A modo de ejemplo, en *Conservatorship of Wendland*, 28 P. 3d 151, 159 (Cal., 2001), el Tribunal Supremo de California nos guía a través del desarrollo legislativo y judicial del Estado en lo referente al rechazo de tratamiento médico.

Además, cabe señalar que la Ley Modelo sobre Directrices Anticipadas, 9 U.L.A. 83 (1993), conocida en inglés como *Uniform Health-Care Decisions Act*, se ha ampliado para reconocer la voluntad de la persona en toda circunstancia en la que no se pueda comunicar sin definir enfermedades o condiciones que limiten su ejecutabilidad. Stephanie K. Marshall señala que aspectos de esta ley modelo solamente habían sido

**III**

El desarrollo de la tecnología médica ha dado paso a diversas interrogantes que pueden surgir por el derecho a rechazar tratamiento médico de los individuos y que no han podido ser resueltas por los tribunales estatales ni federales.[42] La intención del legislador de proteger la voluntad del declarante sobre tratamientos a realizarse en su cuerpo en situaciones de incapacidad nos merece el más profundo respeto. Reafirmamos que le compete a la Asamblea Legislativa ir desarrollando nuestro ordenamiento jurídico al respecto, particularmente cuando la prueba, como ocurre en este caso, es una fragmentada e incompleta que conllevaría especulación de nuestra parte. Por estas mismas razones, no podemos estar contestes con la conclusión de la Opinión de este Tribunal de que el Artículo 6 de la Ley Núm. 160, *supra,* constituye una violación a los derechos constitucionales del declarante bajo las Constituciones de los Estados Unidos y Puerto Rico.

En vista de todo lo anterior, disiento respetuosamente de la Opinión que emite este Tribunal.

_____

adoptados por nueve estados entre 1993 a 2007. S.K. Marshall, *Advance Directives: A Legal Research Guide, Buffalo, Ed.* William S. Hein & Co., Inc., 2008, pág. 25.

[42] 6 Rotunda and Nowak, *Treatise on Constitutional Law*: *Substance and Procedure*, Sec. 21.9(b)(iii) (2007), pág. 224.

Mildred G. Pabón Charneco
Jueza Asociada